**Laurel FISCHER, et al., Plaintiffs,**

v.

**Robert WINTER, in his capacity as Sheriff of Santa Clara County, et al., Defendants.**

**No. C–76–2208 RFP.**

United States District Court, N.D. California.

May 19, 1983.

H. David Grunbaum, Lipton & Lipton, Eileen Matteucci, Santa Clara County Bar Assoc. Law Foundation, Inc., San Jose, Cal., for plaintiffs.

Brian L. Carr, Deputy County Counsel, San Jose, Cal., for defendants.

## MEMORANDUM OF DECISION

PECKHAM, Chief Judge.

This matter came on for trial concerning overcrowded conditions at the Santa Clara County Women's Detention Facility ("WDF") in Milpitas, California. Having heard the testimony and having considered the post-trial submissions of counsel, the court now enters its findings of fact and conclusions of law in the form of this memorandum opinion.

### I. PROCEDURAL BACKGROUND

This case was first filed on October 5, 1976, challenging conditions at WDF, Santa Clara County's main facility housing women who are held in custody both as pretrial detainees and sentenced inmates. The action was filed under 42 U.S.C. § 1983 on behalf of all inmates incarcerated at WDF,[1] seeking declaratory and injunctive relief concerning a wide range of conditions of confinement. After extended litigation, this court entered, on March 25, 1980, a Final Judgment Pursuant to Stipulation.[2] The court retained jurisdiction in the final judgment for purposes of enforcing the terms of the judgment or, "upon application of either party for good cause shown, for the purpose of modifying the terms thereof." Final Judgment § 2.

By motion filed on June 25, 1982, plaintiffs asked the court to reopen and modify the earlier judgment.[3] On August 9, 1982,

---

**1.** The plaintiff class was divided into two subclasses: pretrial inmates and sentenced inmates.

**2.** This judgment and the prior orders and stipulations on which it was based addressed issues of contact visitation rights, expansion of exercise areas, rehabilitation programs, medical care, population in the cell blocks, access to the law library, food preparation, safety bars on upper bunks, and telephone access. The court retained jurisdiction in the final judgment for purposes of enforcing the terms of the judgment or, "upon application of either party for good cause shown, for the purpose of modifying the terms thereof." Final Judgment § 2.

**3.** Plaintiffs filed declarations with the motion tending to show, *inter alia*, three women sleeping in a two-person cell, mattresses on the floor between bunks, unsanitary toilet facilities and drinking fountains, unregulated air and water

this court ordered that the judgment be reopened and proceedings held to determine whether further action of the court was needed to secure to members of the plaintiff class their constitutional rights.

Settlement discussions proved productive, and the court postponed the trial originally scheduled for November, 1982, to allow the parties to continue negotiations. The county filed its "Report on Construction of New Facilities" on February 1, 1983. On March 10, 1983, the parties entered into a Consent Decree which settled, subject to class notice and approval by the court, the issues of jail construction, medical services, food service, maintenance of the facility, staffing and lockdowns, clothing supplies and personal hygiene, exercise, law library access, and release of inmates pursuant to various state statutes.

The Consent Decree excepted from the issues settled only the issue of inmates sleeping on mattresses on the floor pending proposed construction. The Decree recited that the parties were unable to agree on measures to address this issue for the period up to September 16, 1983, the projected completion date for the addition of a 48-bed medium security modular unit at WDF. As actually tried, however, the issues were somewhat broader. The plaintiffs offered testimony not only on the effects of requiring inmates to sleep on mattresses on the floor, but on the effects of overcrowding in general.

Defendants objected to much of this testimony on the grounds that it addressed issues settled in the Consent Decree, but the court allowed the testimony in order to form a more complete and accurate impression of the conditions in the facility prior to the Decree taking effect, and to enable us to determine whether, even after entry of the Decree, conditions at WDF would be unconstitutional and, if so, whether the Decree in combination with such further measures as the court might order, would provide a satisfactory remedy for any constitutional violations found to exist.

Subsequent to the trial, the court issued an order on April 28, 1983, directing the county to cease the practice of housing inmates at WDF on mattresses on the floor in the housing areas, because the court found that this practice imperiled all inmates in the event of a fire or other emergency requiring immediate evacuation. Upon reviewing the evidence presented at trial in light of the pertinent authorities, the court concludes, as is more fully set forth below, that notwithstanding the improvements promised in the Consent Decree, the conditions existing at WDF with present population levels violate the constitutional rights of inmates in a number of respects.

## II. FINDINGS OF FACT

### A. Description of Facility

WDF was constructed in 1964–65 and underwent some remodelling in 1973. It is a single story structure with concrete walls. Inmates are housed in four "general housing" areas: Dorms I and II house misdemeanants and less serious felons; Felony West, a cell block with 14 cells, and Felony South, a cell block with 6 cells, house the more serious felons, with the most serious felons housed in Felony South. Practically speaking, no separation in housing is maintained between pretrial and sentenced inmates. WDF also has "special housing," which is designated for inmates who, for health, safety, or administrative reasons, should be housed separately from the general population. Special housing includes a two-cell unit known as "Juvenile," which is used for protective custody,[4] sick bay, four

temperatures, inadequate medical treatment, insufficient amounts of food, cold food, insects in the food, insufficient time in which to eat, parking lot exhaust fumes in the ventilation system, housing of mentally disturbed inmates along with normal inmates—sometimes to penalize normal inmates, inadequate law library facilities, lockdowns for two or three days at a time as a result of understaffing, outbreaks of violence, inadequate laundry service, insufficient exercise time, no sprinkler system or smoke detectors.

4. Juvenile is formally designated as special housing, since it serves as protective custody,

separation cells, two holding cells, a safety cell, and a drunk tank.

Inmates housed in the two dorms have free access during the day and evening—when not locked down—to a dayroom in which they may watch television, play games, read, talk, or engage in other similar activities. The dayroom also serves as the dining room. Immediately adjacent to the dayroom is the misdemeanor exercise yard, to which there is also free access, except during lockdowns. As part of the Consent Decree, defendants have agreed to maintain and repair all exercise equipment, including ping pong table, exercycles, and volleyball equipment.

The two dorms were originally constructed to be the same size, 1254 square feet, in a rectangular configuration with rows of beds along each wall and storage lockers for use by the inmates against the walls, between the beds. Each dorm had a storage closet occupying the last few feet of the dorm. In Dorm II, this closet has been removed and the space is now filled with beds, expanding the square footage of Dorm II to 1425. Each dorm has an adjacent bathroom containing three toilets and two showers.

The Board of Corrections for the State of California, which inspects and rates all local jail facilities, rates the capacity of each dorm at 24 inmates, a figure that is based on both a square-footage-per-inmate guideline of 50 for dormitory-type housing and on a prescribed toilet-to-inmate ratio of 1:8 and a shower-to-inmate ratio of 1:16. The "self-rated capacity"—essentially the number of beds that the sheriff has placed in the housing units—is 44 for Dorm I and 54 for Dorm II, achieved by replacing single beds with double bunk beds, moving the beds closer together, and converting the storage closet in Dorm II to bed space. The bunk beds are presently spaced one to two feet apart. At the self-rated capacity, each inmate has available to her between 26½ and 28½ square feet of living space in the dormitory area itself. The dayroom and the misdemeanor exercise yard make available to the dormitory inmates, collectively,

additional living space in the amount of 1340 square feet and 3600 square feet respectively.

The two felony areas are similar to one another in construction, with two rows of cells opposite each other, opening on to a common dayroom area, which contains a metal table in the center. Each dayroom has a television set. During the day and evening hours, the cell doors are open, except during lockdowns, and inmates may pass back and forth from their cells to the dayroom. The Consent Decree provides that there shall be no lockdowns in any housing area at WDF for longer than one hour because of understaffing. The county has obligated itself, upon entry of the Decree, to provide additional staffing at WDF whenever necessary to comply with this provision.

Both felony areas make use of an exercise yard off of Felony West. Because there is no direct access from the Felony South unit to the Felony West exercise yard, Felony South inmates obtain access to the yard only when escorted there by staff. Present scheduling calls for these inmates to receive at least three hours per week in the exercise yard. For security reasons, Felony West inmates are locked down when Felony South inmates are using the exercise yard.

The cells in Felony West and Felony South are 61 square feet each, and each has a toilet. The Board-rated capacity is one inmate per cell. The self-rated capacity is two inmates per cell. Again, double bunks have replaced single beds in the cells. At self-rated capacity, each inmate has available 30½ square feet of cell space. The Felony West dayroom is 646 square feet and the Felony West exercise yard is 1262 square feet. The Felony South dayroom is 209 square feet.

The Juvenile area is separated from the rest of the jail housing areas. The two cells in Juvenile are each 77 square feet. They are Board-rated at one inmate each and self-rated at two. A separate exercise yard

but the beds there are usually counted within the general housing capacity of the jail.

of 290 square feet adjoins the Juvenile cells. At self-rated capacity, each inmate has 39½ square feet of cell space.

As to other special housing, the four separation cells are located directly off of Felony South. Three are the same size as the felony-area cells, 61 square feet; one is smaller, at 53 square feet. Inmates confined in these cells do not have dayroom access. The Consent Decree, however, provides that they will be given access to exercise for three hours a week. These cells are also Board-rated at one inmate each. The three larger cells have been double-bunked, so that at self-rated capacity, each inmate has 30½ square feet of living space. Sick bay has six misdemeanor and two felony beds. The holding cells, safety cell, and drunk tank have no beds in them.

The total Board-rated capacity for general housing areas (including Juvenile) is 74, and the self-rated capacity is 142. Special housing adds another 12 beds at Board-rated capacity and 15 at self-rated.[5]

In addition to the above-described features, WDF has a classroom adjacent to the misdemeanor exercise yard; some classes are available to inmates, primarily through an organization of community volunteers. A par course fitness area lies outside and to the north of the WDF building but within its security perimeter, an area which is also large enough for softball. Access to this area for inmates has been sporadic and depends on staffing levels. The Consent Decree provides that defendants "shall attempt to maximize use of the par course consistent with the present exercise schedule."

### B. Population Levels at WDF

The county did not anticipate or prepare for a population increase of the magnitude that has engulfed WDF. In late 1979 and early 1980, the average monthly WDF population actually declined to below 75 inmates. By late 1980, this measure of population was still below 100. During 1980, a consulting firm, Hughes Heiss & Associates, studied the county's need for jail space through 1990,[6] with particular attention to the housing of male inmates; the county was already beset with a serious crowding problem among male inmates at that time. The Heiss Report did warn the county as follows:

> That overcrowding pressures are again expected to be experienced at WDF early in the planning period. While WDF population has been down over recent months, analysis suggests that *populations are likely to significantly exceed rated capacities early in 1981.* Given these projections, it appears that the County should seriously consider providing ten year bed space needs in a construction project beginning in 1981.

Heiss Report at 127 (emphasis added).

Beginning in late 1981, the women's population began to rise steadily and fairly rapidly. The Heiss Report had understated the problem considerably. Heiss had projected a need for 124 beds in 1983. In fact, as noted above, the facility has 157 beds, including special housing, and the population has exceeded that number by as much as 30 to 40 persons on many occasions from mid-1982 to the present. The excess population, until our April 28 order, had been housed on mattresses on the floor, placed between bunks in the dormitories and in the cells in the felony areas.

Although the population pressure at WDF had increased markedly by the fall of 1981, the county did not begin to plan the construction of additional bed capacity for women until after this case was reopened, by which time serious effects of overcrowd-

---

**5.** Regarding certain physical conditions in the housing areas which had been the subject of complaints at the time of the motion to reopen the judgment, the Consent Decree provides for repairs to and/or cleaning of the plumbing, ventilation, and heating systems and their maintenance thereafter, and also repair and repainting of all toilet and shower areas.

**6.** Hughes Heiss & Assoc., Analysis of Adult Justice System Facilities and Program Issues and Alternatives (Nov. 30, 1980) (entered into evidence as Plaintiff's Exhibit 19) (hereinafter cited as "Heiss Report").

ing were already manifest. Perhaps the urgency of the overcrowding problem among the men at the Main Jail distracted the county from the conditions developing at WDF. County planners testified that they thought for a time that the upward trend of the female jail population might be a temporary phenomenon. At the same time, the most severe financial crisis in the county's history, which ultimately necessitated the layoff of some 700 county employees, hampered efforts to meet the county's jail needs.

Whatever the explanation for the county's inaction, since mid-June, 1982, immediately prior to the reopening of the judgment in this case, the population at WDF has consistently exceeded the available beds, even though the number of beds has doubled over the facility's design capacity. Since mid-August, 1982, and continuing through the trial, the population at WDF has generally been in the range of 170 to 190, with a peak population of 210, except when release orders from the Superior Court have temporarily relieved the population.[7]

## C. Effects of Overcrowding

Evidence was offered concerning the effects of crowding on jail populations in general, the effects of current population levels at WDF, and some specific effects of housing inmates on the floor between bunks. In light of the court's April 28 order that mattresses be removed from the floor of the housing areas, the latter evidence will not be referred to specifically or relied on in reaching factual findings concerning current conditions at WDF.

### 1. Fire safety.

Several witnesses gave testimony relevant to the issue of fire safety, and the court received into evidence a Jail Fire Safety Inspection Report dated July 26,

1982 ("Fire Safety Report") (Plaintiff's Exhibit 13) and a follow-up letter dated August 10, 1982 (Plaintiff's Exhibit 14), both prepared by R.F. Mason, Fire Prevention Engineer with the State Fire Marshal's office. No one from that office testified; however, the court did hear testimony from Division Fire Chief Edward Sermone of the Milpitas Fire Department, who accompanied Mr. Mason on his inspection of the jail facilities at Elmwood, including WDF, in July, 1982.

The Fire Safety Report apparently applies to both the men's and the women's jails at Elmwood. The August 10 letter listing conditions in need of correction makes only one specific reference to the women's side at Elmwood—to the need for a smoke detector and automatic sprinkler system for the padded safety cell. The report and letter mention several conditions which do not refer to a specific area in either the men's or women's jail. The testimony of Chief Sermone established that several of the conditions listed as needing correction without specific reference to either the men's side or the women's side were in fact found at WDF—lack of staff training in the use of emergency breathing apparatus, obstruction of exitways and doors, and questionable ability to evacuate inmates properly. The court infers from this testimony, from the titling of the facility reported on as "Elmwood"—presumptively embracing both the men's and women's jails—and from the report's designation of specific area hazards—the women's padded cell and the spray paint room in the shop area—that conditions which are not designated as applying to a particular area apply to Elmwood as a whole, including WDF.

Many of the conditions noted in the report and letter have nothing specifically to do with overcrowding or its effects. They do indicate a disturbing trend, however, when considered in conjunction with the

---

7. On two occasions, Judge Allen of the Santa Clara County Superior Court, then presiding over a class action lawsuit on behalf of the male inmates at the Santa Clara County Main Jail and the Elmwood Men's Facility adjacent

to WDF, *Branson v. Winter,* No. 78807, made orders which resulted in the release of female as well as male inmates prior to the expiration of their sentences.

overcrowding evidence. Aside from a limited number of physical inadequacies—the use of above-ground fuel tanks, the location of the spray paint room (not a WDF problem), the use of some polyurethane mattresses, and the previously-described deficiencies in the WDF safety cell—the other conditions listed as requiring correction all pertain either to staff emergency training or to maintenance of fire suppression equipment. These include general training on fire safety, specific training on the use of the self-contained breathing units, servicing of fire extinguishers, and testing of automatic sprinkler systems.[8] There was also testimony tending to show that the dormitory alarms at WDF, which inmates can use to alert staff of a fire or other emergency, are not regularly tested. Reporter's Transcript ("RT") 156. In sum, while the physical structure may be adequate from a fire safety standpoint, the report indicates that, as of the time it was made, the facility was deficient in *fire readiness.* The evidence does not show, apart from plans for sprinklerizing the padded cell, whether other remedial measures have been taken since the report was issued.

The major fire safety concern affected by overcrowding is the ability of the staff to conduct a safe and rapid evacuation of inmates. In the August 10 letter, Mr. Mason wrote, "We question that the prompt release of inmates can be effected by adequate personnel on duty on all shifts." Even the defendants' jail facilities expert, Mr. Thomas Lonergan, was unwilling to offer an opinion that the jail could be safely evacuated with adequate dispatch in the event of a fire if the number of inmates housed was equal to the present bed capacity. He stated that he would need to see a fire drill before he would be prepared to give such an opinion. The Fire Marshal's report stated that the date of the last fire drill was unknown and that not all employees and staff participated in fire drills.

The evacuation problem has several aspects. The problem of exitways being obstructed by mattresses placed on the floor has been resolved by the court's April 28 order. Other considerations are the general exiting capability needed for a given population housed under specified conditions, the specific exiting procedures at WDF, and the ability of the WDF staff at present training and staffing levels to conduct an emergency evacuation.

According to the testimony of Chief Sermone, the Uniform Fire Code ("UFC") and the Uniform Building Code ("UBC") allow the calculation of maximum occupancy loads for various rooms or buildings based on the use to be made of the space—for example, eating or sleeping—by applying an appropriate square footage factor to the available space. These square footage factors are based on the need for exiting capability in a facility of the type being rated. Neither the UFC nor the UBC contains a load factor for jails. To approximate a proper occupancy load for WDF, Chief Sermone employed the square footage factor for dormitory space—50 square feet per person—from Table 33A of the UBC; this factor, he felt, provided the closest analogue to the conditions at WDF.

Under the Table 33A standard, Chief Sermone calculated the permissible occupancy load for the general housing areas at WDF as follows: 25 in Dorm I; 28 in Dorm II; 30 in Felony West (using dayroom as well as cell space in the calculation); 11–12 in Felony South, for a total of 94–95, compared to the 138 beds that are now located in these areas. Chief Sermone added that his capacity calculations could be increased by up to 10%, or roughly 10 beds, by enlarging the exits, but in no event should the increase be greater than 10%. Chief Sermone emphasized that the dormitory square footage standard assumes free-opening hardware on the exits, rather than a locked

---

**8.** The evidence indicates that WDF has or had at the time of trial no automatic sprinkler systems, but the same Sheriff's Department is responsible for both the men's and women's jails at Elmwood, and lack of maintenance on automatic sprinklers on the men's side is somewhat indicative of the low priority which the Sheriff gives to fire readiness, the main point which mention of these conditions is intended to emphasize.

facility. Although he made no attempt to quantify the adjustment necessary to take account of this difference between a dormitory and a jail, exiting from a locked facility is presumably slower than from one that is not locked.

The exiting procedure to be followed at WDF in the event of an emergency is particularly cumbersome. There is an emergency door leading from the rear of Dorm II into Dorm I and, in the opposite wall of Dorm I, an exit into the Felony West exercise area. The latter exit has a double-keyed door, that is, it must be unlocked from both sides. If it were not possible to exit through the front of the dorms and the dayroom into the misdemeanor exercise area, then all the inmates from the two dorms, 98 at the current bed capacity, would have to exit through the single double-keyed exit into the Felony West exercise area. A second double-keyed door leads out of the Felony West yard to the area outside the perimeter of WDF, should it be necessary to move the inmates out of that yard. Felony West inmates would be evacuated into this same exercise area as would Felony South inmates, who would have to come through two locked doors.

The ability to evacuate quickly is a central concern in fire safety because, as Chief Sermone testified, the first few minutes of a fire are critical. Most fire deaths result from smoke inhalation, rather than from being burned. Bedding and interior furnishings burn first, creating the smoke danger. In addition, if evacuation does not proceed quickly enough, panic is likely to spread, posing an additional danger of injury and further impeding the evacuation. Although evacuation is likely always to be a problem in the event of a major jail fire, the overcrowding at WDF certainly aggravates the problem. Chief Sermone testified that because of overcrowding, his department, which bears fire suppression responsibilities at WDF, would face a major rescue problem in fighting a fire there, necessitating a total departure from normal firefighting tactics and requiring firefighters, in his words, "to take unnecessary chances."

In appraising the risk that fire poses to WDF inmates, the evacuation difficulties just discussed must be considered together with the increasing number of incidents involving fire as the population has increased. RT 164. Even if, as Deputy Heidi Russell's testimony indicated, this increase has not been disproportionate to the population increase, the more fires occur in the facility, the greater the risk that one of them will get out of control. The lack of fire readiness at WDF, discussed previously, can only add to the danger from fire faced by inmates. The seriousness of the present situation received a poignant emphasis in the testimony of Deputy Russell. When questioned about the effect of overcrowding on the WDF staff, she replied,

> We are unable to perform our duties properly as far as supervision. It is very stressful. We can't give—the main thing is we can't—we worry about if there was a hazard there, such as a fire, it would be impossible for us to evacuate all of the people safely.

RT 155.

From the foregoing evidence, the court finds that the defendants are unable adequately to assure the safe evacuation of WDF in the event of a major fire. The facility houses an excessive population for its present exiting capability. Further, the staff is inadequately prepared for such an emergency. All this creates a condition of peril for both inmates and staff.

### 2. Physical security and psychological distress.

The findings with respect to physical security and psychological distress are grouped together because the evidence indicated that for jail inmates, the two are closely and causally interlinked: Higher levels of stress and tension in the jail make fights and assaults more frequent; violent behavior in turn contributes to the stress and discomfort, as well as the lack of physical security, experienced by inmates. The evidence considered in making these findings includes the experimental testimony of an inmate and jail officers, the available

data on WDF violence, and expert testimony offered by both plaintiffs and defendants.

Expert testimony confirmed what common sense would expect—that confinement in a jail is inherently stressful. The jail inmate has been deprived of her liberty and confined at close quarters with many others either accused or convicted of crime, some of whom are mentally disturbed; others, whether disturbed or not, are prone to violence. For many if not most women, enforced separation from families and the stigma of incarceration also produce stress. All of these factors are present to some degree in uncrowded jails. Some level of violence is also a fact of life in a jail, whether crowded or not—as is demonstrated in this case by the assault tabulation entered into evidence as Plaintiff's Exhibit 6. This report extends back as far as the beginning of 1980, at which time WDF's population was at or below its Board-rated capacity. During that period, incidents of assault, both inmate-on-staff and inmate-on-inmate, were reported at the rate of one or two a month.

Expert testimony establishes as a general proposition that overcrowding increases stress, that excessive levels of stress may induce or aggravate physical illness and mental or emotional disturbance, and that overcrowding correlates with both suicidal and assaultive behavior.[9] A common-sense definition of overcrowding would be "too many people in too little space." Correctional professionals have attempted to quantify overcrowding by establishing standards for the minimum square footage that should be available to each inmate in his or her housing area for the maintenance of physical and mental health.

The minimum square footage standards are affected by several variables, the most important of which are opportunities for movement outside the immediate housing area, for activities, and for exercise. Other stress-related variables also influence the square footage standard; these include lighting—both type and amount, noise levels, privacy or the lack thereof, and visitation opportunities. Over the past couple of decades, minimum square footage standards recommended by various professional organizations have increased, from 50 square feet per inmate to 70 or 80, depending on the amount of mobility allowed to the inmates. By professional definition, then, a jail is overcrowded when it does not provide its inmates with the minimum square footage required by the applicable minimum standard.

In California, the Board of Corrections evaluates the adequacy of jail space under the standards in effect when a particular jail was constructed. WDF was built in 1964–65; the standard issued in 1963 governed WDF then and continues to govern it now, establishing the Board-rated capacities discussed *ante,* section II.A. By 1963 professional standards, then, WDF is seriously overcrowded, and if judged against more contemporary standards, the space available to inmates is even more deficient.

Testimony from Deputy Russell and then-inmate Arlene Garriott tended to bear out the predictions of the experts by showing that overcrowding at WDF has increased the levels of stress and tension experienced by inmates and decreased their physical security. As expert testimony further predicts, with overcrowding, the rate of assault by inmate against inmate has increased, albeit not dramatically: While population was doubling, the assault rate increased by a factor of approximately two-and-a-half.[10]

**9.** See RT 85–89, 91, 101–05, 220–23, 225–32, 237–39, 250, 282–83, 318–20, 339. Dr. Coodley, the defendants' psychiatric witness indicated that there is some conflict in the professional literature concerning the effects of overcrowding, but in view of the other testimony, both expert and experiential, and in view of Dr. Coodley's statement that he has never seen an overcrowded jail, the court finds his skepticism unpersuasive.

**10.** The mean average monthly population at WDF for the period from January, 1980, through February, 1981, estimated on the basis of Defendants' Exhibit A, was 83, and in no month did it rise above 100—the level proposed by plaintiffs as a reasonable population cap for WDF. For the period April, 1982 through De-

Ms. Garriott testified that she had personally observed and experienced a difference in her psychological state as crowding increased. Crowding, she stated, "causes me to have great tension, stress, nervous. I get annoyed easily. Temper goes off, just—it is just basically changes a person's personality." Reporter's Transcript ("RT") 187. Ms. Garriott was serving a six month sentence for checks written against insufficient funds. She had no previous criminal record, and had been employed as a quality control inspector in the electronics industry. The defendants suggest that her testimony should be discounted because Dr. Alfred Coodley, the defense psychiatrist, stated that all inmates tend to react negatively to jail conditions and because Ms. Garriott's reaction to the experience of incarceration was likely to have been accentuated by the fact that this was her first time in jail.

The court is unsure why the defendants feel that a multiple-visit inmate would present a more reliable perception of jail conditions, but, in any case, Ms. Garriott testified that when she first entered the facility, it was less crowded than it later became, and she accepted her incarceration and "was able to handle the situation." RT 202. She repeated this statement very forcefully under cross-examination. RT 210–11. Dr. Nancy Shaw, the medical sociologist called by plaintiffs, testified that the time immediately after entry into the facility is normally the period when an inmate's stress is at its highest. Garriott testified that she felt much more stress later on, because of the increased crowding. Her initial response to being in jail was not the bitter and negative attitude described by Dr. Coodley. If her attitude changed later under the impact of the conditions she de-

scribed, that is perhaps understandable, and the court is able to filter out the emotion with which she stated her perceptions. The court finds her a credible witness.

Deputy Russell's testimony supports inferentially a finding that overcrowding at WDF has contributed to greater stress and anxiety among inmates, and supports directly a finding of deterioration in physical security. Her tenure at WDF extends back to 1978. When she started there, WDF housed 60 inmates; she has experienced the entire growth of WDF's population to its peak of 210. During this same period, the staffing of the facility has actually *decreased,* from 38 to 33. Deputy Russell stated that in the current crowded conditions, the staff is unable to perform its supervisory duties properly. She emphasized the staff's worry that in the event of a fire, it would be impossible to evacuate all of the inmates safely. RT 155. This is important not only as regards the physical safety of inmates, discussed *ante,* section II.C.1., but in addition the perception of helplessness in the face of potential disaster creates fear and distress for staff and inmates alike. Ms. Garriott testified that she did not expect to survive a fire at WDF. RT 208. Whether or not she accurately perceives the danger, her belief, together with Deputy Russell's statement, reveals a somewhat morbid pall over life at WDF.

Deputy Russell testified that, under present conditions, the staff is unable to provide security and safety for inmates against assault. The front of the dorms is a transparent substance—glass or plastic. In 1978, prior to double-bunking, a deputy standing outside the dorm had an unob-

cember, 1982, the comparable average figure was 165, almost exactly double the earlier period. In the earlier period, there were 13 reported incidents of inmate-on-inmate assault, an average of .93 assaults per month. From April through mid-November, 1982, which is the latest date of the assault tabulation, inmates reported 17 assaults, for a rate of 2.27 per month. The later assault rate was thus 2.44 times the earlier rate. The actual assault rate in both periods is probably considerably higher than these figures indicate, since testimony showed

that many incidents are not reported. The important point drawn from these figures, however, is the trend they reveal. Presumably, the higher population does not *increase* the rate at which inmates report assaultive incidents. The court assumes that the ratio of reported incidents to actual incidents remains about the same, although, if anything, it may actually decrease with overcrowding, as staff time and attention are spread over a larger number of inmates.

structed view to the far end of the dormitory. The double bunks now in place prevent such a view; fights or attacks can occur in the rear of the dorm without coming to a deputy's attention unless an inmate pushes an alarm. Deputy Russell stated that whether inmates would push an alarm in case of a fight is "a 50/50 thing basically whether they do or not." RT 157. She also stated that on her shift, which is understaffed even at the reduced levels referred to above, the number of deputies available to respond to such an alarm—three—is not adequate.

In the Felony West area, Deputy Russell testified that the number of inmates currently housed makes it impossible for the staff to know and have sufficient rapport with the inmates to supervise them properly. As a result, "someone could go into someone's cell and attack them and you wouldn't even know what was going on." RT 158. The Consent Decree increases staffing somewhat, by providing for Law Enforcement Clerks ("LECs"), who, when fully trained, will free one deputy per shift from the WDF control area to perform general supervision duties.

Overcrowding not only interferes with the staff's ability to supervise and intervene to protect inmates, it contributes in a variety of ways to the stresses and tensions that increase the likelihood of violent incidents. In part, the increased stress experienced by inmates in an overcrowded jail results from the inevitable deterioration of the physical-psychological living environment. A high noise level, according to expert testimony, is associated with increased stress. Ms. Garriott testified that the noise level gets so high in WDF that inmates must yell to make themselves heard to persons sitting a few inches away. She believed that her hearing had been adversely affected by the noise level.

Lack of privacy and lack of personal living space are also mentioned, both by the experts and by Ms. Garriott, as stress-inducing factors. Garriott stated that, as compared to the early part of her stay at WDF, "Now there is nowhere to move. You turn around and you hit somebody." RT 202. Deterioration in sanitary conditions, even if no adverse health effects are demonstrated, induces stress for many inmates. As Garriott testified, some of the inmates do not observe a very high standard of personal hygiene; they shower and change clothes infrequently. These problems obviously become much more noticeable in an overcrowded facility. Both Garriott and Russell noted that the facility is harder to keep clean in its present crowded state.

Overcrowding also creates scarcity—scarcity of beds and bedding, of clothing, of food, of shower time, of locker space, and of staff attention. According to Ms. Garriott, fights often occur over goods or services that are in short supply. Theft is a constant problem that not only provokes fights, but induces anxiety in inmates about the security of their possessions. Certain scarcity problems, particularly food and clothing, should be relieved by the Consent Decree.

Overcrowding has aggravated the problem of stronger and more criminally sophisticated inmates preying on weaker and less sophisticated inmates, for commissary items, money, and sexual favors. Both the general increase in tension level associated with overcrowding and the supervision difficulties discussed above contribute to this problem, but an additional factor of importance is the inability because of overcrowding to segregate inmates adequately by criminal sophistication. For example, Mr. Howard Neil Zinn, Field Representative for the Board of Corrections, offered the observation that since certain types of inmates—a predator-type and a victim-type—cannot be housed safely in the same cell, the multiple occupancy cell area of a jail must be considered operationally full at 80–90% of its bed capacity. RT 299–302. Beyond that level, it becomes almost impossible to avoid unsafe mixing.

Overcrowding also makes other types of population management more difficult in ways that increase tension and the risk of violence. Both Garriott and Russell testified that inmates tend to gather into racial

groups or cliques. RT 164, 204. Like other forms of tension, racial tension seems to increase as the jail population becomes more compacted. RT 211. Dr. Terry Kupers, the plaintiffs' psychiatrist, referred to racial divisions as well as the strong-weak division as "fault lines" along which trouble could be expected to arise when the general stress level in the jail increases. RT 240. Deputy Russell testified that the staff tries to balance the ethnic and racial groups in the various housing areas, because imbalances increase racial tension and lead to fighting, but overcrowding makes it more difficult to manage this balancing. RT 164–65.

In an overcrowded jail, the staff cannot adequately separate and isolate inmates whose special problems or situations require their segregation from the general inmate population. The defendants' jail expert, Mr. Lonergan, testified that the separation capacity of a jail should represent 10–20% of the jail's population. He indicated that if WDF were at a population of 144—and it has been above that level for the past year—a minimum of 14 beds of separation capacity would be needed. Since Juvenile, although used as protective custody, has been counted by both sides as general housing, the separation capacity at WDF consists of eight beds in the sick bay and the four separation cells. By double-celling in the three larger separation cells, WDF—at 15 beds—achieves the bare minimum of special housing needed at a population of 144. Separation housing should in general be available on the basis of one inmate to a cell, although in some instances the conditions for which two inmates must be separated from the general population might not prevent them from being housed with one another. In the double-bunked separation cells, however, two inmates are con-fined with only 30 square feet of living space each for twenty-four hours a day, without dayroom or recreation area access, except for three hours a week of exercise provided for in the proposed Consent Decree.

One result of inadequate special housing capacity at WDF is that inmates with mental and emotional disturbances are housed with the general inmate population. Deputy Russell testified that on average each dorm might house two such persons, who may be acting out, although not usually in a violent manner. She stated that these persons require special attention from staff and from other inmates. RT 137–39. She stated that in some cases these mentally disturbed inmates have attacked others, attempted suicide, or become so withdrawn that they have had to be hospitalized. In addition to providing an inadequate environment for the disturbed prisoners, housing them with the general population creates additional tension and stress for the other inmates.

Despite the deterioration of conditions at WDF as population has increased and staffing has decreased, and despite the resulting increase in stress and tension affecting both staff and inmates, the *rate* of inmate assaults on staff has remained basically constant between the relatively uncrowded period of 1980 through early 1981 and the crowded period in 1982.[11] The rate for inmate assaults on inmates, as noted previously, *has* increased more than the population, but not dramatically so. The number of suicide attempts has also shown a slight upward trend as the facility has become more crowded.[12]

That these figures do not show a greater increase in violence at WDF is a tribute to

**11.** For a comparison of average population figures for the two periods, see note 10, *supra*. In the period January, 1980-February, 1981, there were 7 inmate-on-staff assaults—.5 per month. In the April-November, 1982 period, there were 8—a rate of 1.07 per month. Thus, both population and the occurrence of inmate-on-staff assaults approximately doubled. Of course, since the number of persons on the staff did not increase between the two periods, an indi-vidual staff member's risk of being assaulted also doubled.

**12.** *In the January, 1980-February, 1981 period,* there were two suicide attempts—.14 per month. From January, 1982 through November 12, four attempts occurred—.38 per month, an increase by a factor of 2.7.

the professionalism of the staff. Even un-ᴸ der these difficult conditions, the staff manifests a sense of responsibility and caring that communicates itself to the inmates and seems to foster a spirit of cooperation in such matters as watching out for the mentally disordered inmates and assuring the availability of bunks for pregnant women. From Ms. Garriott's testimony, the inmates also seem to have developed what we might term a "culture of survival," in which they try to police themselves somewhat, to break up fights and so on. RT 195. Notwithstanding the efforts of both staff and inmates, it appears from the testimony of both Russell and Garriott that violence, sometimes resulting in injury, is an everyday occurrence and a constant threat at WDF.

The Consent Decree will help to alleviate some of the effects of overcrowding. The provision of the Decree concerning lockdowns—committing the defendants to avoid lockdowns for longer than one hour as a result of understaffing—assures inmates freedom of movement as the normal condition. The opportunity for movement and activity outside the sleeping area, whether cell or dormitory, is of great importance for the reduction of stress. The provisions regarding exercise are also helpful in this regard. Of course, the adequacy of the space to which the inmates have access when they move out of their sleeping areas is also important; the common area available to Felony South inmates is extremely small relative to the number of inmates now housed there.

Supervision will improve somewhat when the LECs are fully trained, freeing one deputy per shift for floor staffing duties. The provisions on food and clothing will relieve important scarcities, as noted earlier. Improvements to medical procedures and increases in psychiatric services and better maintenance of the facility should

also be helpful in reducing stress. The court's April 28 order requiring defendants to cease housing inmates on mattresses on the floor in the housing areas, while grounded upon the danger presented in the event of an emergency, also relieves a major source of stress.[13]

Even with the improvements to be effected ·by the Consent Decree and the relief ordered by this court with respect to inmates being housed on the floor, it is not open to question that the facility remains seriously overcrowded—housing at present more than double its rated capacity. The crowding both shrinks the immediate living space available to each inmate in the housing areas and also increases the population pressure on the common areas, reducing the relief that movement into and around those areas can provide. While overcrowding persists, the levels of stress and tension and the associated levels of violence can be expected to remain significantly higher than would be the case if the population more nearly matched the planned-for capacity of the jail. These effects of overcrowding are compounded by the failure to increase jail staffing to cope with the increased population load, and a dormitory configuration that makes adequate supervision from outside the dormitory practically impossible.

### 3. *Physical health.*

The effects of overcrowding on the physical health of inmates, apart from the dangers of fires and violence from other inmates, are, on the record developed, somewhat more problematic. The evidence pertained mostly to problems that are addressed either in the Consent Decree or by the court's April 28 order.

Theory leads us, once again, to expect adverse health effects from overcrowding. Dr. Shaw testified to the health effects of stress, particularly a lowering of the body's

---

**13.** This statement, of course, assumes that the defendants implement the order in a manner that does not itself increase stress. For example, if the defendants were to take a substantial part of the dayroom for bed space and make it unavailable for recreation and general living

space to the inmates collectively, this would reduce what all the expert witnesses agreed was the single most important factor mitigating the effects of crowding—the availability of opportunity for movement and activity outside the immediate housing area.

resistance to illness, indicating that the stress factors discussed *ante,* section II.C.2., could have a negative impact on inmates' health. RT 87. She also indicated that both the increased contact among people and the increased impact on toilet facilities and the like as a result of crowding could be expected to induce a higher illness rate. RT 89.

Mr. Steve Brooks, the county sanitarian called by plaintiffs, gave testimony, and plaintiffs offered his last two inspection reports into evidence (as Plaintiff's Exhibits 11 and 12), showing inadequate maintenance with respect to the bathrooms, the heating and ventilation units, and other aspects of the facility as well. Assuming that these conditions stem to some degree from overcrowding and that they in fact increase the health risks to inmates, the county has undertaken in the Consent Decree to repair and maintain the plumbing, ventilation, and heating systems and to repaint all toilet and shower areas. Similarly with respect to dietary inadequacies identified by Mr. Brooks in his 1982 report, the Consent Decree addresses these and goes beyond them.

Even with the elimination of unsanitary conditions, dietary inadequacies, and the potential for droplet infection of inmates sleeping between bunks on the floor, both Dr. Shaw and Mr. Brooks testified that proximity alone would promote the spread of communicable disease. The testimony of the defendants' witness, Dr. Dorming Wong, did not contradict this view. Dr. Wong is a member of the medical staff at Valley Medical Center who has clinical responsibilities at WDF. He possesses a Master of Public Health degree and has studied epidemiology. He testified that the most crucial variable in the spread of disease in a population is the number of interactions among its members, and that this number would be significantly larger in a "closed boundary" population such as the WDF population, than in a non-closed boundary population—i.e., one where people could freely enter and leave. He also stated that the number of interactions increases at a higher rate than the rate of increase in population. On the level of theory, then,

Dr. Wong's testimony agrees with that of the other witnesses expert in the health field—a crowded population such as that at WDF is at greater risk for the spread of communicable health problems.

Dr. Wong also testified, however, based on his inspection of the physician diagnoses of WDF inmates who requested and received medical attention, that the incidence of three types of communicable health problems—cold symptoms, lice, and scabies—was not unusually high. There is some ambiguity in this testimony. It appears that Dr. Wong was stating his opinion that the incidence he observed from the records was not unusually high for a population *having the characteristics of this population,* i.e., a closed boundary and a given physical density of population. He did *not* state that a member of the jail population was at no greater risk of contracting a communicable disease than a person in the outside community. He did state that, with respect to the expected occurrence of disease, a prison population could only be compared to other prison populations. He also offered the view that inmates have greater access to medical care than the general population, so that he would not expect an underreporting of disease at WDF.

Although the court believes from the evidence that WDF inmates may be at somewhat greater risk of contracting a communicable disease than would be the case if WDF were less crowded, there is no evidentiary basis to determine whether this risk is significant or insignificant. Certainly if a wave of serious illness had occurred in WDF, it would have come to the court's attention. The court agrees that the WDF inmates probably have, on average, greater access to medical care than they would have outside the facility, and this access will be further improved by the procedures contained in the Consent Decree.

In one respect, the sanitation at WDF is clearly inadequate, as even defendants' own jail expert, Mr. Lonergan testified—that is, in the availability of toilet and shower facilities to serve the dormitories. As previous-

ly mentioned, professional standards require one toilet for every 8 inmates and one shower for every 16. At WDF's self-rated capacity, Dorm I has one toilet for approximately 15 inmates and one shower for 22. Dorm II has one toilet for 18 inmates and one shower for 27.

Since WDF's population has been consistently above its self-rated capacity for many months, the actual load on these bathroom facilities is even greater. Needless to say, the results of this overload include not only friction and stress among the inmates over the use of the facilities, but greater difficulty in maintaining them in a sanitary condition and more likelihood of breakdowns. The commitment of the county in the Consent Decree to better maintenance is, by itself, an insufficient guarantee of improvement in the bathroom situation, as the defendants themselves appear to have acknowledged. Thus, Mr. Lonergan stated that for Dorms I and II to house 50 persons each in an acceptable manner, it would be necessary to construct an additional 4 toilets, 4 basins, and 2 showers for each dorm.

## III. CONCLUSIONS OF LAW

Although the recent phase of this lawsuit commenced with a motion to reopen and modify the earlier consent judgment, it has been tried essentially as a new action. The plaintiffs have attempted to demonstrate that present conditions at WDF fall short of the constitutional minima as clarified and defined in the recent cases from the Supreme Court and the Ninth Circuit. The defendants have argued that under the standards of those cases, no constitutional

violations have been established. Neither party has referred to rights or duties under the terms of the earlier judgment. The court agrees that the present action should be treated as a *de novo* trial on the constitutionality of conditions at WDF and frames the analysis accordingly.

### A. Constitutional Standards

■ Conditions of confinement in jails and prisons come under constitutional scrutiny when pretrial detainees claim the protection of the due process clauses of the Fifth or the Fourteenth Amendments, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), or when sentenced inmates assert that they are subjected to cruel and unusual punishment in violation of the Eighth Amendment, *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982).[14]

■ A person charged with a crime may be detained in custody prior to trial to assure his availability for trial and sentencing, if convicted, but punishment prior to a determination of guilt would violate his right to due process. *Bell v. Wolfish, supra*, 441 U.S. at 533–35, 99 S.Ct. at 1870–71. In examining the conditions of pretrial detention, the question is whether those conditions "amount to punishment." *Id.* at 536–37, 99 S.Ct. at 1872–73. Absent a showing of "an expressed intent to punish," a court must determine whether a challenged condition or restriction "is reasonably related to a legitimate governmental objective," and thus is non-punitive, or whether instead

14. The only issues before the court are plaintiffs' federal constitutional claims. In their closing brief, plaintiffs request the court to consider "[t]he standards imposed by sections 4001 and 4015" of the California Penal Code in determining whether a due process violation has occurred. While state law can create liberty interests, *Olim v. Wakinekona*, —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), as well as property interests, *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), to which procedural due process rights attach, the protection of pretrial detainees from conditions of confinement that "amount to punishment" under the standard enunciated in *Bell v. Wolfish*, 441 U.S. 520, 536–37, 99 S.Ct. 1861, 1872–73, 60 L.Ed.2d 447 (1979), *see infra*, is a *substantive* due process right. State law standards for the treatment of inmates may be relevant to the *Bell v. Wolfish* inquiry in the same way that expert and professional association standards are relevant. Conditions of confinement that violate state law do not, however, constitute a *per se* violation of the Fourteenth Amendment. The due process issue requires the court to make an independent assessment of the evidence under the *Wolfish* standard and does not require any interpretation or application of state law.

it is "arbitrary and purposeless," which would allow the court to infer a punitive intent. *Id.* at 539, 99 S.Ct. at 1874.

■ Once a person has been convicted of a crime, he may be punished, but the Eighth Amendment prohibits any punishment that involves the "unnecessary and wanton infliction of pain," *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1979), or that is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). *See Rhodes v. Chapman, supra,* 452 U.S. at 346, 101 S.Ct. at 2398; *Hoptowit v. Ray, supra,* 682 F.2d at 1246. The Ninth Circuit has held that in analyzing claims of Eighth Amendment violations, "courts must look at discrete areas of basic human needs[:] . . . food, clothing, shelter, sanitation, medical care, and personal safety." If an institution meets these needs adequately, it fulfills its Eighth Amendment obligations. *Id.*

■ Since sentenced inmates may be held under conditions that are punitive, while pretrial inmates may not be, the courts have said that the due process clause affords greater protections to unsentenced inmates than the Eighth Amendment affords to the convicted. *See Manney v. Cabell,* 654 F.2d 1280, 1284 n. 5 (9th Cir.1980); *Lock v. Jenkins,* 641 F.2d 488, 491 n. 7 (7th Cir. 1981). Since WDF houses both pretrial detainees and convicted misdemeanants and felons, both standards are relevant to determining the county's liability, although, to the extent that WDF is unable to segregate pretrial and sentenced inmates, it would appear that the higher standard applicable under the due process clause would have to be met for the entire facility.

■ The recent teachings of the Supreme Court and the Ninth Circuit have stressed the limited role of federal courts in challenges by prisoners to their conditions of confinement.

Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Bell v. Wolfish, supra,* 441 U.S. at 539, 99 S.Ct. at 1874.

Any needed prison reform is an executive and legislative responsibility. The function of a court is limited to determining whether a constitutional violation has occurred, and to fashioning a remedy that does no more and no less than correct that particular constitutional violation.

*Hoptowit v. Ray, supra,* 682 F.2d at 1246 (citations omitted).

The Supreme Court has cautioned that there is no "'one man, one cell' principle lurking in the Due Process Clause," *Bell v. Wolfish, supra,* 441 U.S. at 542, 99 S.Ct. at 1875, and that the minimum space standards established by various professional associations, although perhaps "instructive in certain cases, . . . do not establish the constitutional minima." *Id.* at 543 n. 27, 99 S.Ct. at 1876 n. 27. Notwithstanding this cautionary language, federal courts must continue and have continued to discharge their duty to determine whether constitutional violations have occurred and, if need be, to provide a remedy, albeit one that considers "the cost of compliance and the effect on legitimate security needs of the prison . . . [and] the bona fide steps that prison officials are taking to alleviate poor prison conditions." *Hoptowit v. Ray, supra,* 682 F.2d at 1247.

■ Overcrowding *per se* is not unconstitutional; what must be tested against constitutional standards are the basic living conditions in a jail. Often, however, overcrowding is the root cause of the deficiencies in those conditions. *Id.* at 1248. The application of the Eighth Amendment standard of *Rhodes v. Chapman* and *Hoptowit v. Ray* to an overcrowded jail is, if not easy, at least straightforward. The court must consider the effects of overcrowding on the way in which the facility meets basic human needs for food, clothing, shelter, sanitation, medical care, and personal safety. The jail must meet the "constitutional minima" as to each area of need; if its perform-

ance on any one fails to meet "evolving standards of decency," an Eighth Amendment violation has occurred. *Id.* at 1249.

The proper application of the *Wolfish* due process standard to an overcrowded jail is not as straightforward. *Wolfish* holds that if there is no express intent to punish, then a jail condition or restriction can violate due process only if it is "arbitrary or purposeless," permitting an inference of punitive intent. 441 U.S. at 539, 99 S.Ct. at 1874. At first blush, a condition such as overcrowding that results from forces beyond the control of and through no willful act by jail officials would appear not to fit well with the *Wolfish* analytical framework. Overcrowding and its effects may not be reasonable means to a legitimate end, but neither do they appear to manifest an intent to punish. The worst that jail officials can be guilty of in such cases is gross neglect.

■ Although the *Wolfish* majority might have spoken more clearly, it did not intend to insulate from due process scrutiny any and all jails in which wretched conditions have resulted from neglect rather than a conscious purpose to punish. *Wolfish* must be understood in terms of its special facts: it involved challenges to double-bunking and to a number of security-related rules and practices at the Metropolitan Correctional Center (MCC), a federally operated short-term custodial facility in New York City designed primarily to house pretrial detainees. As the Court noted:

> The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals stated: "[I]t represented the architectural embodiment of the best and most progressive penological planning.

*Id.* at 525, 99 S.Ct. at 1866.

No evidence was presented to the trial court on the effects of double-bunking. The district court rested its conclusion that the practice was unconstitutional on 1) the fact that the rooms were designed to house only one inmate, and 2) its judgment that confining two persons in a cell of this size (75 square feet) was a "fundamental denial of decency, privacy, personal security, and, simply, civilized humanity." *Id.* at 542, 99 S.Ct. at 1875, quoting *Wolfish v. United States,* 428 F.Supp. 333, 339 (S.D.N.Y.1977), *aff'd in part,* 573 F.2d 118 (2d Cir.1978), *rev'd,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Reversing both the court of appeals and the district court, Justice Rehnquist, writing for the Court, made the statement quoted previously that the due process clause creates no "one man, one cell" principle. Significantly, however, he added that

> [w]hile confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record.

441 U.S. at 542, 99 S.Ct. at 1875 (footnote omitted).

■ In subsequent cases involving facilities where conditions are much further from penological ideals than the MCC, the courts have applied the "genuine privations and hardship" language of *Wolfish* as an objective standard that lends additional content to the *Wolfish* due process standard as applied to overcrowded jails and prisons. *See, e.g., Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981); *Lock v. Jenkins,* 641 F.2d 488, 493 (7th Cir.1981); *Campbell v. Cauthon,* 623 F.2d 503, 507 (8th Cir.1980). Although the Ninth Circuit has not had a major case involving the conditions of pretrial detention since *Wolfish,* the court believes that the Ninth Circuit would agree that assessing conditions of confinement—as opposed to correctional and security policies—against a "genuine privations and hardship" standard provides a useful guide here for determining whether those conditions are "reasonably related to a legitimate

governmental goal." *Bell v. Wolfish, supra,* 441 U.S. at 539, 99 S.Ct. at 1874.

### B. Application of Standards to WDF

#### 1. Fire safety.

▮ To meet constitutional requirements, a jail must afford its inmates adequate personal safety. *Hoptowit v. Ray, supra,* 682 F.2d at 1249. This does not mean a risk-free environment. No institution, and particularly no jail, could be held to such a high standard. Fire dangers can be reduced, but not eliminated. Moreover, jails are inherently more difficult to evacuate than other facilities, because fire exiting requirements inevitably conflict with security requirements. The level of fire safety that is constitutionally sufficient for a jail must be determined against this background.

▮ The level of fire safety at WDF in its present overcrowded state is inadequate. Lack of "fire readiness" in a broad sense—which includes staff training and preparation—combines with insufficient exiting capability for the present population to create, as the court has found, a condition of peril. WDF has been fortunate enough so far to avoid any situation that would seriously strain its evacuation capability, but jail fires involving loss of life have occurred elsewhere. The court does not need to wait for a tragedy to occur before concluding that the personal safety of WDF inmates is at risk to a constitutionally impermissible degree.

The defendants must take immediate steps to remedy any deficiencies in fire readiness identified in the State Fire Marshal's report which have not already been addressed. The defendants should report to the court in writing on any remedial measures which have been taken since the time of the report and on any other plans which are proposed for implementation in the immediate future. The court orders the defendants to demonstrate through an actual test their ability to accomplish a safe and timely evacuation of a population of the size that defendants would propose as the

facility's maximum. The details of such a test and the criteria that it must satisfy will be discussed at a subsequent hearing on remedies. The court will, at that time, consider appointment of a Special Master to evaluate and make recommendations as to WDF's evacuation procedures and preparation and to monitor the conduct of the test.

#### 2. Physical security and psychological distress.

In judging whether present conditions at WDF meet constitutional minima for physical security and psychological distress, the court assumes that the reforms proposed in the Consent Decree will be carried out and that the court's April 28 order will continue to prevent the housing of inmates on mattresses on the floor in the housing areas. The court then asks, if all else remains unchanged, are the conditions constitutionally acceptable? The court concludes that the answer as to both sentenced and unsentenced inmates is no.

▮ The court is fully aware, as discussed *ante* at 290–291, that confinement in a jail is unavoidably stressful and that some level of jail violence is probably inevitable. Conditions of confinement are not punitive, let alone cruel and unusual, simply because they interfere with a jail inmate's "understandable desire to live as comfortably as possible and with as little restraint as possible during confinement." *Bell v. Wolfish, supra,* 441 U.S. at 537, 99 S.Ct. at 1873. Nor are jail conditions unconstitutional because they fail to live up to the standards established by those whose business it is to tell society as a whole—and to recommend to the legislative and executive branches—how to treat inmates in order to achieve the goals of enlightened social policy.

▮ At WDF, however, the degree of physical insecurity and psychological distress suffered by inmates not only falls short of the ideal; it falls so far short that it is constitutionally unacceptable. As the evidence showed, the sheer compaction of inmates at WDF creates severe stress from noise, lack of privacy and shortage of space.

This high level of stress has increased assaults by inmates on inmates. At the same time, the failure to increase staffing and, indeed, an actual reduction in staffing during the time when the average population at WDF doubled, combined with the obstacles to supervision presented by the dormitory configuration have lessened the ability of the jail staff to protect inmates. This reduction in the level of protection not only increases physical risk but also worsens the psychological climate of the jail. Further, the failure of the jail's separation and isolation capability to keep pace with the growth of population means that more problem inmates must be housed in the general housing areas where their behavior can create additional stress and risk for other inmates and where they are more difficult for the staff to supervise. Additionally, in a facility as crowded as WDF, the staff loses some of its ability to manage the population by grouping inmates so as to reduce the risk of violence.

It is this combination of factors that leads the court to conclude that the present conditions at WDF, even as modified by the Consent Decree and the court's April 28 order, by failing to assure an adequate level of physical security and psychological comfort, would offend the general public's view of what decency requires in the long-term confinement of jail inmates. As *Hoptowit* reminds us, it is the *public's* standard of decency, rather than an expert standard, that should guide the judicial determination as to the cruel and unusual character of punishment. 682 F.2d at 1246. The conclusion that these conditions constitute cruel and unusual punishment *a fortiori* determines that they subject pretrial inmates to genuine privations and hardship, if continued over any considerable length of time. The duration of the confinement under these conditions is of obvious importance. Conditions that may simply be vexing to an inmate but not unconstitutional if that inmate were affected for only a brief period would amount to punishment if continued for an extended period; on a longer-term basis, this punishment would become

cruel and unusual. *See Lareau v. Manson, supra,* 651 F.2d at 105, 108–09.

The court will not at this time specify, as the *Lareau* court did, a maximum length of time that pretrial and sentenced inmates can be subjected to these conditions. Our factual findings and legal conclusions make clear that the present unconstitutional conditions are the product of several interrelated variables. A variety of remedies is, therefore, possible, addressing to varying degrees the problems of absolute numbers of inmates housed at WDF, the physical environment in which they are housed, the duration of confinement under a given set of conditions, and the supervision, separation, and population management capabilities of the facility. The present conjunction of these factors is inadequate; the court will not presume to state that a particular array of palliative measures is constitutionally required.

It may be that the only adequate and practical remedy will consist of either a rigid, court-determined population cap or court-established limits on the length of time that inmates may be held at WDF under specified conditions or both, but prior to going forward with such a remedy, the court will allow the defendants an opportunity to formulate alternatives that will sufficiently mitigate the present conditions to satisfy constitutional minima while leaving the county with maximum discretion in the employment of its resources. *See Hoptowit v. Ray, supra,* 682 F.2d at 1247.

### 3. *Physical health and sanitation.*

Although overcrowding probably has some adverse effects on the physical health of inmates at WDF, considering the evidence before the court and the improvements which may be anticipated from the Consent Decree, any adverse health effects of overcrowding do not rise to the level of a constitutional violation. As to sanitation, the Consent Decree and the court's April 28 order will improve it to at least an adequate level, except for the bathroom facilities, which must be augmented as recommended by the county's expert, Mr. Lonergan.

■ In Eighth Amendment cases, a jail's obligation to provide for the medical needs of inmates is measured against the standard enunciated in *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) of "deliberate indifference to serious medical needs of prisoners." Failure to provide needed medical care could also result in "genuine privation," thereby "amounting to punishment" of pretrial detainees in violation of due process. *Bell v. Wolfish, supra.* Under the circumstances of this case, to establish a violation under either of these standards, it would have to be shown that serious health problems have resulted from overcrowding and that the county has failed to take effective measures to counter them.[15] The evidence does permit a finding of increased health risk at WDF as a result of crowding, but evidence of serious health problems is lacking. Thus, the defendants cannot be found liable for failing to meet their obligation to provide adequately for inmates' health needs.

■ The defendants have failed to provide adequately for the sanitation needs of inmates, however, by failing to increase bathroom facilities at all during the time that they doubled the self-rated bed capacity of WDF. This failure to provide for a basic human need is cruel and unusual punishment to sentenced inmates and amounts to punishment of pretrial detainees in violation of due process. *Bell v. Wolfish, supra; Hoptowit v. Ray, supra.* The defendants represented at the close of trial that they would act immediately on Mr. Lonergan's recommendation to construct additional bathroom facilities. The court accepts the county's proposed construction undertaking as adequate to remedy the deficiency.

## C. Further Proceedings

Having found constitutional violations in the conditions of confinement at WDF, as specified in the foregoing portions of this opinion, further proceedings are necessary to tailor remedies for the particular violations, with the exception of the bathroom facilities. The court will have before it at the time of such further proceeding the evidentiary record from the trial, which contains considerable material relevant to various proposed remedies. The court will consider other evidentiary submissions on the subject of remedy. The court directs the parties to prepare remedial proposals based on the findings and conclusions of the court.

■ In formulating a remedy, the court will be guided by the principles set forth in *Hoptowit v. Ray, supra,* 682 F.2d at 1247, and the parties must necessarily keep these guidelines in mind when drafting their proposed remedies. Much evidence has been presented that the county, in addition to its pioneering efforts in the area of alternatives to incarceration, is moving ahead vigorously, after a slow start, on jail construction. The court is also cognizant of the county's financial difficulties and the sacrifices that these have entailed in many programs. Nevertheless, where, as here, the court has found that inmates are confined under unconstitutional conditions, the court is obligated to provide a remedy.

The parties should contact the court to arrange a date for a hearing on proposed remedies and a schedule for the submission of written proposals and supporting materials in advance of the hearing.

SO ORDERED.

---

15. In the area of physical health effects of overcrowding, as in other areas, the due process standard demands more of a custodial facility than does the cruel and unusual punishment standard. *See ante* at 298, but it is not now necessary to calibrate the distinction. Just as a conclusion that certain jail conditions constitute cruel and unusual punishment must lead *a fortiori* to finding a due process violation, so the conclusion that a condition does not "amount to punishment" compels *a fortiori* the conclusion that it does not violate the Eighth Amendment.