Alan R. DOHNER; Wendell Holmes; D. Lee Goldstein IV; Gerald Vinson King; Bruce William Lee; and William Collazo; individually and as representative of all persons similarly situated, Plaintiffs,

v.

D.J. McCARTHY, Director of the California Department of Corrections; and W. Estelle, Superintendent, California Men's Colony, Defendants.

No. CV 83–7587 PAR.

United States District Court, C.D. California.

Oct. 9, 1985.

John H. Hagar, Jr., Marina Del Rey, Cal., Fred Okrand, ACLU, Los Angeles, Cal., for plaintiffs.

Carol S. Fredericks, Donald E. De Nicola, Deputy Attys. Gen., Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RYMER, District Judge.

This is a class action in which plaintiffs, inmates at the California Men's Colony ("CMC"), challenge the constitutionality of conditions of confinement. They seek to enjoin defendants, the Director of the California Department of Corrections and officials in charge of the prison, from continuing certain practices which they claim amount to cruel and unusual punishment in violation of the Eighth Amendment.[1] Specifically, plaintiffs complain about "double-celling", the conversion of "day-rooms" into dormitories, general overcrowding, insufficient staff, and incipient deterioration in housing, programs, classifications and facilities. Plaintiffs also contend that they enjoy a state created liberty interest in visitation, medical care and work credits which is protected by the Fourteenth Amendment.

Plaintiffs' Motion for Preliminary Injunction was denied May 31, 1984. That ruling was affirmed on appeal to the Court of

---

1. An outline of plaintiffs' requested relief is at- tached as Appendix I.

Appeals for The Ninth Circuit in an unpublished Memorandum.[2] A class comprised of all inmates confined at CMC-East[3] was certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure; plaintiffs' request for certification of subclasses representing various classifications was denied. At trial plaintiffs renewed their request for subclasses composed of all Category J, K and O inmates[4] and another consisting of all inmates who were in protective custody status upon leaving a reception center but who are housed in general population at CMC without reclassification.

Trial was held in two installments, the first in San Luis Obispo at the Superior Court Building for the County of San Luis Obispo during the week of July 30, 1985[5] and the second, August 13–19 at the United States District Court for the Central District. More than fifty inmates and numerous correctional officers and experts testified.

I also toured the facility with counsel for both sides on three occasions. The first occurred on March 30, 1984 in connection with the request for preliminary relief. Prior to trial we made a day visit on July 26, 1985 and an evening visit July 29th. All visits were unannounced. The day tours covered the entire prison including housing units,[6] dining room and kitchens, recreational facilities, industries, classrooms, hospital and chapels. The evening visit was concentrated in the housing, recreation and program areas.

Having considered the evidence and argument of counsel, having evaluated the credibility of witnesses, having seen the facility, having observed both inmates and staff in the normal routine of prison life, and having developed from all these sources a sense of the health of the institution and the inmates it houses, I have reached the following findings of fact and conclusion of law:

## FINDINGS OF FACT

### Cell Design and Capacity

1. CMC was designed and built during the 1950s. The facility is comprised of four housing "quads," each consisting of two cellblocks. [Exh. 116–1.] A cellblock contains three floors of cells. Corrections officials who were involved in its design believed that CMC would never be double-celled because of its unique cell construction. The 1200 "cells" at the facility are each divided into two separate "living units" separated by a permanent partition. Bunks are built-in to each side of the partition in an "over and under" configuration, so that the top of the partition on one side supports an "over" bunk and the bottom on the other side supports an "under" bunk. [Exh. 116–2, 3.] These units were designed to hold a single inmate in close, but private, quarters. The overall floor space in the living unit is approximately 56 square feet; all but 39 square feet are taken up by the bed and a toilet-sink fixture. Because of the extremely small size of these units, the Department of Corrections had a long

2. The Memorandum was filed February 8, 1985. An amended Memorandum was filed April 12, 1985.

3. CMC-East is a fenced-in prison facility with cellblocks and gun towers. CMC-West is an adjacent prison camp which also houses inmates in a lower level of security. There is no constitutional challenge to conditions of confinement at CMC-West; it is relevant to this action only to the extent that inmates housed there draw on certain services, such as medical and psychological staff, provided at CMC-East.

4. Category J includes inmates with recent major mental illness or mental illness in partial remission. Category K inmates have pronounced social inadequacies. Category O describes inmates with chronic medical problems.

5. The Presiding Judge of the San Luis Obispo Superior Court graciously consented to the Federal Court's sitting in that building. This accommodation made it possible safely and conveniently to hear testimony from a great many of the plaintiff class.

6. My inspection of the units on July 27 included a brief stay in a locked double cell with my law clerk.

standing policy against double-celling at CMC.

2. In addition to a bed and the toilet-sink combination, each of the living units contains a desk, some shelves and a chair. Each unit has either a window or some other open space for light and ventilation. The window may be opened. Each unit is also connected to an air ventilation system which supplies fresh air to the unit and withdraws stale air from the unit. All units are supplied with hot and cold running water. Each has electric lighting. Only one-half the cells (four of eight of the cellblocks), however, have electricity provided for inmates' use within their housing unit.

3. Dayrooms are adjacent to the cellblocks. Prior to the advent of overcrowding, each was equipped with a wall-mounted television, table and chairs. [Exh. 113–2.] Half of the dayrooms have been converted to dormitories [Exh. 113–12]; in those cellblocks in which there is no electrical outlet, the dayrooms have not been converted and those are open to inmates all day and until lockdown in the evening (or later for those watching television).

### Double-celling

4. Double-celling was instituted at CMC in December, 1983 ("Phase I"). Prior to implementation of the double-celling plan, CMC had been the least overcrowded celled institution in the California System, with the population running at about 102% of its design capacity. At the time of the preliminary injunction in May, 1984, the population had risen to 3,115. As of June 23, 1985 there were 3,833 inmates, or 159% of design capacity. Phase IV is nearing completion. Eighteen hundred out of a total of 2,400 units will then be double-celled. Six hundred single cells will be left. Together with 108 dormitory beds, the capacity will

have increased to 4,308, excluding the hospital and administrative segregation units, which will exceed the design optimum by 179.5%.

5. Because of the unique "over and under" construction of cells at CMC, half of the living units have built-in upper berths and the other half, lower berths. This makes it impossible to install a two-tier bunk bed. Units of both types have been double-celled. *See* pictures attached as Appendix II. The second bed in all units which are double-celled is attached to the wall and is designed to fold up and out of the way when not in use. However the discomfort and inconvenience of double-celling in a lower berth unit is appreciably more acute than in the alternate configuration.

6. With the second bed folded up, floor space in the unit remains the same (56 square feet of which 39 are useable), but is shared by two inmates. The result is about 19½ square feet per person. With the second bed down, the floor space is reduced to approximately 23 square feet, or 11½ square feet per person. The two beds are separated by a strip 5–6 inches wide. Therefore the total remaining space is deceptively large in that, with the bed down, that 5–6 inch strip is the only effective "corridor" leading from the door of the unit to the toilet area at the other end of the cell.[7] In a double-celled upper berth unit, the lack of effective floor space makes it difficult for the inmate sleeping on the upper bunk to get down to the toilet without disturbing the person in the lower bunk.[8] Several inmates have sustained injuries on account of losing their balance. Also, when the second bed is down, the desk cannot be used because the bed extends into the area where the chair would otherwise be; the chair, in turn, is wedged against the wall or toilet and that, in turn,

---

7. I am on the slight side of average for a female, and relatively agile; nevertheless I found it both awkward and difficult to make this passage. It was virtually impossible in a lower berth unit without climbing onto the bed. Because of my experience I credit inmate testimony of severe inconvenience.

8. Since May of 1984 inmates assigned to the second bed have been allowed to sleep with their heads away from the toilet if they wish.

further reduces the effective use of the remaining 11½ square feet per person.[9]

7. Each inmate has a key to his own cell.

8. A cell of the size at CMC is not unconstitutionally small for single occupancy. However, to place two in a unit of that size is neither recommended, *see* Appendix III, nor consistent with what the corrections profession would want. Defendant's expert, Amos E. Reed, who is Secretary of the Department of Corrections for the State of Washington and eminently qualified to opine on corrections, testified that cell size is not a mandatory standard but can become one if the cell ceases to meet basic human needs or is so egregious that it is unacceptable to reasonable persons in the profession. According to the Secretary, influencing factors in evaluating reasonableness include (1) the level of security, with individual cells clearly preferrable for upper levels of security (as at CMC); (2) the cell's "extended space," which is defined by the time and space available to the inmate away from the living unit including, for example, the number of hours required to be locked-in, the ability to come and go freely, and "out-time" for work, meals, education and recreation; (3) the character of the individual prisoner; and (4) a measured process for weighing the individual's characteristics in the decision to double-cell. In Reed's opinion, double-celling of inmates who have the opportunity to come and go, as they do in light of the "extended space" at CMC, is not egregious unless something else enters the picture, or confinement to a double-cell is protracted over time and has become detrimental to the physical or mental health of the in-

mates beyond that level of harm which is suffered on account of the normal discomfort and inconvenience of prison life.

9. In addition to placing inmates in doubled-up living units, dayrooms in half the cellblocks in A, B and C-Quads have been converted into dormitories measuring 29 feet 5 inches by 11 feet. [Exh. 113–12.] Five to six men are housed in each dorm with a range of 54–64 square feet per person. All six have a key to enter and leave. The dormitories have a toilet-sink combination. To the extent that dayrooms have been converted, space which otherwise would be part of the unit's "extended space" is compromised.

### Population Characteristics and Classification

10. The population of CMC is unique in several respects. The institution has been designated as one of the two in the California system for housing the mentally ill and medically afflicted. Also, CMC has been perceived as "neutral" ground, free of gang activity, and a safety-valve for those encountering trouble at other prisons. Thus a number of inmates previously in protective custody have safely been housed in the general population at CMC. Finally, a significant portion of the CMC population is comprised of prisoners convicted of sex offenses and second degree murder.

As of May, 1985 there were 219 inmates classified by defendants as psychotic, 5 as neurotic, 73 with personality disorders, 461 in mental health category J (Partial Care Psychiatric), and 208 in mental health category K (Supportive Care). These are classifications that require special programming.[10] The majority, but not all, of the

---

**9.** Not all bunks are occupied.

**10.** Specifically, the California Department of Corrections Classification Manual, Chapter 2200, section 2221, defines Category J inmates as follows: "This category is for inmates with recent major mental illness and/or inmates whose mental illness is in partial remission and who have difficulty functioning in mainline/general population programs because of residual psychiatric disability or symptoms. This category is for psychiatric inmates who do

not need the intensity of service provided in a psychiatric hospital. These inmates need supportive milieu in rehabilitation programming to maintain and improve social and psychiatric functioning." Section 2222 defines Category K inmates as follows: "This category is for inmates who have pronounced social inadequacies because of mental retardation, developmental disability or personally [sic] disorders. These inmates have difficulty functioning in mainline/general population programs."

inmates so classified are confined to D-Quad. Currently half of D-Quad is double-celled; there are 300 double-cells, 350 single-cells, and 156 special treatment unit cells (all singles).[11] Of the total population of 830, 750–760 are Category J and K inmates. As of August 7 one Category J and 23 K inmates were in B-Quad; three Category J and seven K inmates were in C-Quad.

Only CMC and California Mens Facility (Vacaville) accept Category J and K inmates. Approximately 10% of the California prison population (or 4500 inmates) is in need of psychiatric services. Accordingly the number of these inmates in these categories is apt to increase disproportionally to the overall increase in the population at CMC.

CMC is also one of the few California prisons designated for inmates classified as Category N (Convalescent Medical Inpatient) and O (Out-patient Medical) prisoners with serious physical problems.

Of the seven Category J inmates who testified, four are single-celled. Of the three who are double-celled, two get along with their cellmate; one does not, but it is because he is "flippant." Two Category K inmates testified; both were single-celled. Category O inmates who are double-celled testified to physical difficulties such as climbing onto a bunk (which would be required in any event if housed in a unit with an upper berth configuration), or having to assist a cellmate in doing so; and to injuries from furnishings (which, in the case of an inmate whose eye was scratched by a bed-spring, cannot be attributable to double-celling). One cannot hear testimony from Category J, K and O inmates without finding that they are particularly troubled and vulnerable persons, but at the same time that each has problems and characteristics that distinguish him from others similarly classified.

11. Many other inmates, not assigned special medical or psychological classifications, are confined at CMC because they would require "Protective Custody" status in any other California prison. Defendants' records indicate, as an example, that approximately 800 inmates with protective custody needs were assigned to CMC during the fiscal year prior to trial. The numbers of such inmates transferred to CMC has increased because of the closure of Protective Housing Units ("PHU's") at other institutions. According to defendants' records, PHU facilities at the California Institute for Men (approximately 500 beds), at San Quentin (approximately 300 beds), and at Deuel Vocational Institute (a range from 110 to 500 beds) have closed since September, 1983, with the result that by April 1985, only 231 PHU beds remained in the entire California Department of Corrections prison system.

Of the six inmates who testified to formerly being in protective custody, five clearly (the sixth arguably) manifested no need for housing outside the general population at CMC. Nor was there any substantial indication that any "protective cus-

11. The number of Special Intermediate Treatment Unit ("SITU") cells has been increased from six to fourteen. Inmates are assigned to SITU when a psychiatrist deems it necessary for purposes of control. Each is a single cell, furnished with a mattress and pillow and some bedding (unless the prisoner has suicidal tendencies). No personal belongings are permitted because if an inmate is there he poses a danger to himself and others. Inmates so housed are cell-fed and exercised for one hour a day in an adjacent exercise area. (That area consists of a strip along the outside perimeter of the building about 6 feet wide and 60 feet long.) Although plaintiffs suggest that SITU inmates are not adequately clothed in that some are naked from time to time, and that their psychological needs are inadequately cared for, none appeared so unclothed on my inspection, the credible evidence indicates that they are never assigned without clothes, a medical trained assistant ("MTA") is on duty during two watches, and a member of the psychiatric staff pays a daily visit.

There are 132 Intermediate Treatment Units ("ITU") in D-Quad. All are single-celled. ITU inmates are given the same bedding and clothing as the general population; however because of their greater potential for acting out in the evening, they are locked down at 6:00 P.M.

"P cells" are likewise single cell units and are stripped except for mattresses. These are used for detention of short duration for custodial or psychiatric problems.

tody" inmate suffered uniquely from double-celling.

12. Newly arrived inmates are housed in a reception Unit ("fish row") in B-Quad, if space is available. Of the 60 cells in the reception area 30 are double-celled; therefore if 90 prisoners arrive per day, two-thirds spend their first night in a double-cell. Given the increased intake of new inmates, some are being housed in available units in other Quads.

Reception at CMC involves at least two decisions, both influenced by double-celling. The first is the inmate's classification; the second, his housing status. Although a screening process is in place, evidence with respect to its effectiveness is equivocal. Less concern is manifest for general population inmates than for Category J or K's. In the case of the former, after a correctional coordinator has reviewed an inmate's central file and the inmate has completed an orientation course, a classification (housing) decision is made. Criteria considered in designating an inmate to single-cell status include whether he is an effeminate homosexual or an aggressive homosexual, whether he is a psychotic in remission, or whether he has medical problems that could not tolerate a double-cell. There is evidence that these criteria are not always applied and do not always result in single-cell housing even where that kind of treatment is medically or psychologically indicated.

In the case of Category J's and K's, newly arrived inmates are tentatively assigned a unit according to what is available; most are sent directly to D-Quad. There a new inmate's file is preliminarily reviewed for such things as medical and mental condition, enemy situations, and special medication needs. The preferred initial assignment is a single cell. After that the inmate is evaluated by a member of the psychiatric staff and goes through the regular orientation process. A classification decision is then made by a committee composed of the D-Quad administrator, a correctional counselor, the assignment Lieutenant, a program Lieutenant and one psychiatrist, Medical Trained Assistant ("MTA") or nurse. The inmate is present when this decision is made. Regardless of whether the inmate is assigned to general or special population, no responsible CMC official has any idea how many inmates require a single-cell or have been classified with single-cell status. However, the more double-cells there are, the fewer the placement options. Thus, the screening that occurs and the decisions that result appear to be driven increasingly by availability of single-cells rather than suitability for double-cells.

At the same time there is no substantial evidence of severe detriment or pain, apart from the fear and discomfort otherwise associated with being closely confined with an unknown cellmate.[12] Inmates testified to problems of incompatibility; but it appears that assignment officials are responsive and that inmates who have experienced such problems and have complained, received a prompt, if inconvenient, change in cells. Nevertheless it is clear that as overcrowding continues over time, the influx of Category J and K inmates increases, and screening capacity is stretched even thinner, the risk of fatal incompatibility is dangerously enhanced.

### The General Environment and "Extended Space"

13. Inmates are required to be inside their cells from nine to eleven hours, generally closer to eleven or more than to nine. (Occasionally weather or security problems cause lock downs for longer.) Inmates leave the living unit between 6:45–7:00 A.M. for breakfast; must return to the cell at 11:30 A.M. for a count unless they are at work, and remain there for up to an hour and one-half until released for lunch; are locked down for a count before dinner; and must be in their cells for the night by 10:15 P.M. (unless watching TV in a dayroom). Because of overcrowding, meal service

---

**12.** In so finding it should be noted that the fear is real indeed. It is fortunate, and hopefully not merely fortuitous, that so few serious or violent incidents have occurred.

takes longer to complete. Inmates are released for meals by floor, cellblock by cellblock on a rotating basis. The effect is to increase the overall amount of in-cell time.

Other than the mandated times for lockdown, inmates may circulate freely between their cells and the yard. Given the prison's location, weather is generally accommodating.

14. Cellblocks are basically clean and orderly; while the living units are crowded and cluttered, they do not appear dirty, unduly run down or unsanitary. I saw no evidence of insects or rodent infestation. During daytime hours relatively few inmates are in their units, aside from periods of lockdown.[13] However, those who are, and nonworking inmates at noon, are confined with their cellmate in space which is incredibly cramped and neither adequate nor comfortable for two. Noticeably more inmates are in their cells at night. Weather permitting (as it was on the occasion of my visit), however the bulk of the population that is not at work is in the yard.

Although by no means intolerable, noise is a problem.[14] There is no way to open and close the unit doors, which are heavy metal, except to slam them. Further, because of the "over and under" design, each cell is divided by a partition through which unusually loud sound from the adjacent living unit can be heard.

Finally, even though I find no substantial evidence that ventilation is inadequate, nevertheless on a hot day it is terribly hot. For two people under these conditions the living unit is unpleasantly close.[15] Remarkably, however, despite an occasionally disagreeable whiff, no offensive odor is apparent overall.

15. CMC has been well maintained despite the overcrowding. [Exh. 101.] Except for destruction of an industries building by fire,[16] there has been no noticeable deterioration in the physical plant since my previous visit in May, 1985.

16. Each Quad encloses a grass recreation yard surrounded by a track. [Exh. 111-1, 2.] All four yards have a weight area; one has a tennis court; and all but D-Quad have a mini-canteen. Inmates are free to use the yard at any time other than lockdowns. CMC also has a well-equipped gymnasium, used both for sports and special events (boxing competitions, movies, etc.). [Exh. 111-1, 2, 3.] Access to the gym is rotated by Quad and limited by privilege group status.[17]

There are three chapels [Exh. 103-1, 2]; a library (well stocked and well-appointed,

---

13. This may, of course, be as attributable to the lack of privacy in a double-cell, as to choice or to other activities.

14. Defendants' expert Reed emphasized the important role which control of sound plays in making both management and the general health of prisoners more acceptable.

15. A number of inmates react out of claustrophobia or consternation by punching out the glass of living unit windows. Another fairly common practice is to block noise by a towel in the space between the door and the floor; the effect is to curtail circulation. Also, in many cells the air duct is covered to avert dust or alter the flow, in either case resulting in a stuffier room.

16. Although reconstruction is planned, there is no indication of when.

17. Inmates are classified in Privilege Group A, B, C or D. An inmate employed in appropriate work or enrolled in an education program is in Privilege Group A. Such an inmate draws more money and has greater access to movies, telephone, packages, etc. than a B, C or D inmate. Members of Group A also are eligible for unlimited family visits and get "day for day" credit (*i.e.,* one day off for every day served). Newly transferred inmates who were in Privilege Group A at a previous institution retain that status, so long as they have applied for employment or education. A newly arrived inmate who seeks program involvement is placed in Privilege Group B, with his status being upgraded either when a position is found or he has been involuntarily unassigned for more than 40 days. "B" inmates draw less than A's and have fewer privileges; in particular, for every two days with good behavior they get one day off ("⅓ time"). Privilege Group C is comprised of inmates who are voluntarily unassigned. There are no family visits for such inmates. They draw little; have limited access to entertainment; and get no time-off. Finally, Privilege Group D inmates are those in administrative segregation.

but with a maximum safety capacity of 49 persons) [Exh. 102–1, 2, 3]; a hospital with emergency room and surgical suite [Exh. 106–1, 2, 3, 4, 5];[18] numerous classrooms [Exh. 108] and vocational training facilities [Exh. 109–1–16];[19] and several factories [Exh. 110–1.2].[20]

There is a dining room and utility kitchen in each Quad [Exh. 104–1, 2, 3], serviced out of a main kitchen facility in Building B [Exh. 104–4, 5, 6, 7]. Although the floor covering is worn and slippery, the kitchen and dining areas appear clean and adequately equipped. I have seen the kitchen and dining area before and during use; and I have observed no significant evidence of dirt, mess, infestation or other unsanitary conditions.[21] The meals appear nourishing[22] and relatively appetizing for institutional food.

17. As of July 31, 1985 approximately 2772 work or education assignments were available. 2758.5 inmates were actually assigned; 666 were unassigned as a result of their medical, psychiatric, reception or segregation status. Further, 309.5 were "involuntarily unassigned" and 225 "voluntarily unassigned." Thus at the present time some 1200 inmates (or 30% of the population) are without assignments.[23]

18. Just before trial the hospital ceased to perform surgeries, evidently because of inadequate staff. Surgical needs are therefore being met by neighboring hospitals. The hospital is also the subject of state court litigation and has structural deficiencies (such as inadequate air-conditioning, separation of the intensive care unit from the operating theater and absence of a dietary kitchen) which preclude its being licensed by the California Department of Health Services.

19. Education classes take place in Buildings B, D, L and Q. Each classroom accommodates 20–24 inmates. The classrooms look like a typical public school classroom; they are bright and airy and appear suitably equipped for the task. The vocational training rooms are large and also appear well equipped to give training in such vocations as television repair, electronics, drafting, maintenance, sewing machine and auto repair, dry cleaning, sheet metal work and a machine shop.

20. *See supra,* n. 16. At least two industries operate a double shift, as do several of the vocational programs. Industries include shoe

*Physical and Psychological Consequences of Double-Celling*

18. As explained by defendants' expert Reed, the greater the double-celling over time, the greater the likelihood of being unable to address the multiple needs of prisoners in the area of their positive development. The opportunity to make a contribution, express creativeness and strengthen ego is important to life inside, and later outside, the prison. Similarly it is important that the physical and intellectual energy of prisoners be occupied with acceptable, positive activities. To the extent neither is done, the effects of prolonged double-celling are exacerbated.

19. There is no sense of undue tension among the inmates or staff. Inmates appear calm and reasonably cared for; their input through the Men's Advisory Council and the Litigation Team managing this action has clearly been responsible, significant and appropriate. Staff appears both concerned and in charge. According to Secretary Reed, if there were tension one would expect it to be manifest in the manner inmates respond to staff; the state of

manufacture and repair, laundry, textile products, welding, computer programming and auto repair. The facilities are excellent except for the absence of a sprinkler system. *See infra* at 420.

21. Inmate testimony about urination in mop sinks and contamination of food is entitled to little weight. To the extent such things happen they appear occasional; any serious problem of an on going nature is belied both by the condition of the facilities that I personally saw, and by testimony of responsible officials to the contrary.

22. CMC has no dietician. However, its staff consults the dietician at Soledad. Except for those for inmates with unusual dietary needs, there is no substantial evidence that the food does not meet basic daily requirements.

23. This compares unfavorably with the situation in July, 1983. At that time there were 2180 available assignments; 361 inmates were unassigned because of medical or related status; and 162—or 20%—were unassigned without reason.

dress or undress; inmate annoyance; unacceptable language or behavior; indications that passive inmates are being exploited; "bully boy" inmates running the prison; laxity in relation to weapons and contraband; inmates drunk or under the influence of drugs; and evidence of the staff's not being present or in control. He saw none of these conditions at CMC, nor were any such indicia apparent to me.

20. It is undeniably true that life in a double-celled environment is less private and more trying than in single-cell housing. Plaintiff's expert Dr. Craig Haney testified that inmates react by social and psychological withdrawal, and that overcrowding poses particular problems for psychologically vulnerable people such as Category J and K inmates. Inmates also testified to the general deterioration of conditions at CMC since the advent of double-celling.

21. The physical and mental health of inmates relates to the duration as well as the fact of double-celling. There are two aspects to this relationship: first, in-cell time on a day-to-day basis, and second, the elapsed time of exposure to the double-cell

experience. As a person is kept in such a cell over a prolonged period of time, the intensity of the experience increases. This is particularly true of those persons who are double-celled for whom double-celling is medically or psychologically inappropriate.[24]

22. The extent of detriment to the physical and mental health of prisoners exposed to double-celling over time may be significantly influenced by the degree of hope and encouragement to inmates, and to the institution, that an end is in sight. One component is the State's exerting itself to eliminate over-crowding in general and in the cell in particular.[25]

### General Overcrowding at CMC

23. Various conditions at CMC have deteriorated since double-celling and are exacerbated by general overcrowding.

A. *Violence.* Since double-celling began there has been an increase in the number of incidents of assaultive conduct as well as an increase of such incidents on a per capita basis.[26] However there is no

**24.** Secretary Reed suggests that harm, other than that suffered simply on account of the convenience and discomfort of being in prison, might be manifest by an inmate's displaying a move away from normal behavior, a trend toward psychosis or violence, and an uncharacteristically uncooperative attitude.

**25.** Defendants' expert so testified.

**26.** Both sides submitted statistical data on the violence-related infractions.

Plaintiffs' expert, Jeannette Money, is a Ph.D. candidate in Political Science at the University of California at Los Angeles. She used regression analysis to conclude, among other things, that "administrative" per capita violence decreased since double-celling was implemented; per capita "serious" violence has increased (from approximately 1.8 per 100 inmates in January, 1983 to 2.6 infractions per 100 inmates by April, 1985); the increase in serious violence over time is statistically related to the degree of overcrowding over time; the increase in assaultive behavior is reflected in A, C and D-Quads; and the incidence of drug-related infractions increased in B-Quad. The study does not show a consistent finding of increased rates of serious violence across the three quads that have been double-celled for a significant period of time. At the same time it shows that there were in-

creases in violence and other infractions in D-Quad when it was operating at 95–100% capacity before being double-celled. Ms. Money attributes this phenomenon to the disproportionate increase in Category J and K inmates. Plaintiffs' expert also opined that there is a statistical relationship between an increase in population as a whole and an increase in recidivism; however, her analysis does not relate to the same pool and is therefore unpersuasive. Nor does her study overall afford any basis for comparing rates of violence before double-celling or overcrowding, and after. Finally there is some question about her approach, which was to develop a statistical model most closely approximating the results shown in the data collected, rather than to take a hypothesis, control for those factors for which there ought to be a control, and determine whether the hypothesis is true. A number of control variables such as inmate characteristics, presence of individuals who repeatedly commit assaults, and the single/double-cell status of the offenders were not considered. Thus the results are inconclusive on the impact of double-celling or overcrowding at CMC.

Defendants' expert was Sheldon Ekland-Olson, a Professor of Sociology at the University of Texas. He concluded that the rate of assault-related behavior at CMC has remained fairly

substantial evidence that it has increased to a dangerous level (the current per capita rate of assaultive behavior labeled as "serious" is 2.5 per 100; the incidence of assaults with weapons or fatal assaults is .6 per 100), or that the increase is causally related to double-celling itself. There were no lock-downs of a security type in the year before double-celling began; there have been several since although there is no evidence that these have been institution-wide rather than single-Quad events. In 1984 there were 15 deaths and 5 so far in 1985; however there is no discernible difference between the statistics before double-celling and after. Despite the fact that the ratio of correctional officers to inmates has gone from approximately 1:8 before double-celling to 1:10 as of May, 1985,[27] the staff is in control and there is no evidence of indifference to the physical safety of the population.

B. *Psychiatric Services.* Hundreds of CMC inmates are assigned to classification categories which require "supportive milieu in rehabilitation programming to maintain and improve social and psychiatric functioning." The psychiatric staff at CMC has not increased since double-celling began; indeed, not in 12 years. There were six psychologists on staff in December 1983 but only four at the time of trial; there are seven psychiatrists now as compared with six before. There is also an occupational therapist and 22 MTA's. Provision of psychiatric services is heavily dependent on part-time interns from the California School of Professional Psychology in Fresno. CMC psychiatric personnel also serve inmates housed at CMC-West.

Inmates testified to long waits for psychiatric counseling. At the same time there is a sick call line five days a week and requests for sick call are answered within 24 hours. Various therapy programs are available but there may be a wait before enrollment is possible.

Finally, while there was testimony by D-Quad inmates about lengthy lines which occasionally led to their being unable to obtain medication, the D-Quad Administrator indicated the pill line was open for an average of 1.5 hours and did not close until all were served.

The professional staff to inmate ratio is without question on the margin of acceptability, particularly given the disproportionately increasing number of Category J and K prisoners. So long as CMC is one of the two institutions in the State designated for accommodating inmates with special requirements for psychological services, staffing to meet those requirements is imperative. While I cannot find that either the numbers of staff or quality of care reflects deliberate indifference or inattention to the serious needs of inmates at the present time, restoring and maintaining at least the same ratio of professional staff to inmates in need of psychiatric care as in 1983 is a major component of constitutionality of conditions of confinement at CMC.

C. *Medical Services.* For the last several years the hospital has not complied with licensing requirements for hospitals in California, and a number of deficiencies have been cited by the Department of Health Services. Many are structural problems which are partly in the process of being corrected.[28] (The facility and its li-

---

constant (2.83 per 100 inmates in 1983 compared with 2.77 per 100 inmates from December 1983 through May 1985); the rate of "serious" assaultive behavior has increased from 2.03 per 100 before double-celling to 2.42 since; the increase in "serious" assaults is due largely to increased incidents in D-Quad; and there is a "slight" negative correlation between the extent of double-celling and the rate of assaultive behavior among double-celled inmates.

**27.** At trial defendants offered evidence that instead of 397 correctional officers in May, 1985

[Ex. 43] there were 477 in June, 1985; the effect is to make the current ratio 1:8 [Ex. 129 for identification]. However there is no indication that so many guards were hired in the interim and no other explanation for the difference in numbers.

**28.** For example, to be licensed the facility must have a different system of air conditioning (for which money has not been appropriated). A fire door is needed for surgery and a contiguous room for post-operative care, and a dietary

censing problems are the subject of a pending action in state court.)

As of July 1985 the hospital is no longer providing surgical service. There is inadequate staff to do so. However arrangements have been made with area hospitals and there is no evidence that they do not meet prisoner needs as well or better than provided on site. Eye and dental specialists in the community also hold clinics at the institution on a regular basis.

The overall ratio of medical staff to inmates has decreased: from 1:63 in December, 1983 to 1:81 in June, 1985 for CMC-East and from 1:75 to 1:123 for the combined population the facility serves. Waiting lists are long, but there is no substantial evidence of delay in providing essential care. Although one inmate testified that surgery he felt was needed had not been performed, there is no indication that the surgery was not elective or that the problem is pervasive. Inmates who testified about in-cell accidents also testified that treatment was promptly available. All inmates whom I saw, including those Category O's who testified, have an appearance of being well cared-for.

D. *Food.* CMC has no dietary kitchen or dietician although efforts have been made to hire one. Some inmates have experienced difficulty in obtaining food they can tolerate. However, these instances appear isolated and do not rise to the level of deliberate indifference. Otherwise there is no evidence that food lacks appropriate quality or variety, or that inmates are underfed or undernourished.

Even though lines are longer and delays greater, the facilities do not appear overtaxed by the prison population. New refrigeration capacity has been acquired and there is no showing of deliberate indifference to safety in the preparation, storage or handling of food.

E. *Visitation.* Facilities for visitation include a large indoor room with adjacent patio, a large outside area, and a trailer for overnight visits with family. There is evidence that visits now take place in more crowded surroundings, that it takes longer to arrange a family visit, and that three general visiting sessions have been curtailed due to crowding. Conditions are much more crowded on the weekend; during my tours (each was on a weekday during the day or in the evening) hardly anyone was in the visiting areas. Nothing in the record suggests that any inmate is being denied visitation because of the size of the population.

F. *Personal Hygiene.* There is evidence that some inmates have experienced minor shortages in such items as toilet paper. However there is no indication that this is a pervasive or serious problem. Inmates complain of inadequate water pressure, especially on the second and third floors. Although inconvenient, there is no evidence that inmates are deprived of showers.

G. *Vocation and Education Programs.* In 1976 California adopted a determinate sentencing law. Since then the Legislature has mandated that all prison "good time" (sentence reduction) be accomplished only through approved vocational and education programs, *see California Penal Code*, §§ 2931, 2932 and 2933, and that all new prisons currently under construction be built with adequate facilities for vocational and educational training for inmates.

Prior to the commencement of double-celling and for several months thereafter, CMC was able to offer employment and educational programs to substantially all of its inmate population. Now CMC's inmate population exceeds available assignments, and there are several hundred inmates awaiting assignment. However there is no substantial evidence that any inmate is denied the opportunity of day-for-day credit for unreasonable periods of time. Inmates testified to waiting lists of considerable length for work and school, but as they may sign up for more than one education or employment opportunity there is duplication on the lists making the length of the

kitchen is required. The latter is under construction.

lists inconclusive. There is no substantial evidence that inmates who wish schooling or work cannot obtain some program within a month or so.

It is important that sufficient programs be provided (1) to assure that inmates may earn sentence reduction credits in order not further to aggravate overcrowded conditions; (2) to maintain the inmates' physical and intellectual health; and (3) to assure enough quality "out-time" to qualify as "extended space" and thereby partly compensate for confinement in a double cell. That the same program facilities and opportunities continue to be available at least in the proportion presently offered is critical to constitutionality of conditions of confinement at CMC.

H. *Recreation.* CMC's facilities are adequate and not so crowded as to deprive any inmate of appropriate recreation. By the same token, it is critical to constitutionality of conditions of confinement at CMC that recreation facilities as they presently exist be maintained in their entirety and be used only for the purpose for which they were intended. Specifically, access, for at least the same relative times as presently allowed, to the gymnasium for sports, to entertainment and related activities, to the yard as presently laid out in each of the Quads, and to the chapels and adjacent areas as they currently stand, must continue unaltered.

I. *Ventilation.* The CMC cellblock ventilation system takes in fresh air through a duct, pushes it through a steam coil, and forces it through a main duct system to individual housing units. Next to the duct that allows fresh air into the unit is an exhaust duct, pulling exhaust air out of the units into the cellblock basement. [Exh. 113–9, 10, 11.] The cells can be heated by the steam coil, but they cannot be cooled. Although at one time operated on for 45 minutes and off for 15 minutes and not operated from 9:00 AM to 2:00 PM, the system is presently run full-time, 24 hours per day. The system provides 105 cubic feet per minute of outside air to each cell, which meets or exceeds applicable standards.

J. *Plumbing.* In addition to inadequate pressure, plaintiffs are concerned that CMC will exceed its water permit limit with the completion of Phase IV. While that is the case, responsible officials are confident that problem will be solved.

K. *Electricity and Lighting.* Lighting does not comport with ACA standards. There is evidence of insufficiency for inmates lying in the lower berthed double-cells. Although half of the cells do not have electrical outlets, radios and televisions can be operated on battery power and it is apparent that many are.

L. *Fire Safety.* CMC is constructed of cement and steel and is therefore, as such, relatively free of fire hazard. However, living units contain clothes, bedding, papers and like materials which are inflammable. No serious fire has occurred in the 24 years its fire chief recalls. The Fire Marshall has not ordered any of the facilities closed because of hazardous conditions.

At the same time, there are no fire alarms in the cell blocks, no smoke detectors (except as part of the ventilation system), no automatic sprinkler system in the cellblocks or classrooms or industries, and no water hose or extinguisher inside any cellblock. Although defendant's expert was not aware of their absence, he would regard deficiencies such as these as serious. The procedure for responding to a cellblock fire is cumbersome at best, dangerous at worst. If an emergency occurs, correctional officers must notify institutional officials by telephone. At night during "First Watch" (midnight to 7:00 A.M.) there is only one officer in each cellblock and inmates are locked in their units. Outer doors of the cellblock are locked from the outside. In case of a fire the correctional officer must call for assistance, release inmates, unlock grill gates, open emergency doors at each end of the floor and wait for the Quad officers to open outside doors. The stairs at the far end of the cellblocks are narrow and accommodate only one person at a time. Few fire drills

are conducted; thus no responsible official can say for sure what the chances for effective evacuation would be.

While that part of the evacuation procedure involving an outside officer's coming to unlock the outer cellblock doors may be justified from a security point of view, the absence of fire safety equipment cannot be so explained and is substantially unacceptable. Although an extremely close question, I cannot find deliberate indifference on the strength of the institution's experience; but for the future, basic precautions which comport with contemporary standards of safety cannot prudently be ignored.

M. *Emergency Procedures*. Having made an *in camera* review of the manual for various contingencies in light of concerns articulated by plaintiffs, I cannot find deliberate indifference to the problems of mass evacuation and safety of the prison population.

N. *Noise*. Although the level of noise is clearly annoying and increasingly irritating over time, it is not so intolerable or intrusive that it renders the unit unfit for human habitation.

O. *Laundry Exchange*. Although lines are lengthy and the wait may be inconvenient, clean clothing is available. There is no showing of deliberate indifference. Inmates appear to be appropriately and neatly clothed.

P. *Safety*. Inmates have suffered injuries within double-celled units because of the configuration.

Q. *Double-celling in Administrative Segregation*. CMC has established a second disciplinary detention housing unit known as "The Annex," in B-Quad. Discipline cells in B-Quad are single-celled units; units in the Administrative Segregation Unit ("Admin. Seg.") are double-celled. They are measureably larger and more tolerably configured than cellblock units; in particular, the beds are placed one over the other in bunk-bed style. [Exh. 114–1.] Inmates are confined to those cells during investigation of and punishment for, in-prison discipline offenses. If the charge against the inmate is a serious one, he often remains confined to Admin. Seg. until after criminal charges are filed and a trial is held in the San Luis Obispo Superior Court. Admin. Seg. inmates confined to double-cells are locked in those cells for 23 hours per day. Inmates confined in Admin. Seg. are not assigned to work or education programs and are limited to one hour per day exercise. The exercise area is contiguous to the Admin. Seg. area. [Exh. 114–3, 4.] There is a handball available. Admin. Seg. inmates eat in their cells, and have limited personal property and restricted visitation. Confinement can last several months.

R. *Standards Governing Placement Into General Population*. Flexibility in housing decisions has substantially been lost with the near completion of Phase IV. According to Secretary Reed, room for the exercise of discretion in making assignments is one of the significant factors a professional considers in evaluating whether confinement in a double-cell is constitutional. Maintaining sufficient flexibility to assure that housing decisions are based on individual assessment and not on availability of units is critical to constitutionality of conditions of confinement at CMC.

*Impact of System-wide Overcrowding*

24. California is recognized as having one of the most serious problems of overcrowding of any State in the country. The present design capacity is 29,042; the number of inmates is 45,603. Thus overall California institutions and camps are operating at 157% of design capacity. Level III institutions are worse than average: there are six ranging from 143.3% to 215.4% over design capacity. Since February, 1985 the Department of Corrections has experienced a net increase of 170 inmates per week.[29]

25. Although plans have been on the boards for an "extensive" construction pro-

29. This compares with Department projections of a 69 inmate increase per week.

gram[30] to reduce overcrowding, not a single completion date has been met. For several of the proposed projects no site has been found; others are bogged down in Environmental Impact Reviews; one has been cancelled altogether. Even if all were completed, the additional beds would not house the *present* population, let alone the numbers accruing as time goes on. There will be at least 65,000 inmates by 1988[31]—more than 24,000 more than projected capacity.

26. The Department has completed and filled one-half of the new prison at Vacaville and will open part of the new Tehachapi Institution in October, 1985. It has also broken ground for new prisons in San Diego and at "New Folsom." (Ground breaking is also imminent for the Northern California Women's Facility.)

27. Double-celling at CMC is the product of systematic overcrowding and court-ordered reduction in population of Northern California institutions.[32] After considering a number of options, prison officials chose to employ double-celling rather than some other arrangement in part because alternatives such as converting the gymnasium or classrooms raised security concerns and in part because to double-cell rather than convert preserved those facilities for inmate use.

28. Double-celling at CMC was initiated in response to an emergency and was perceived as a temporary measure.[33] It was so represented to the Court in opposition to plaintiffs' motion for preliminary injunction. It has turned out not to be temporary at all. It was intended to be capped at 450. It has not turned out to be capped at all.

29. According to the Department's representative, if the present population increase continues and if no interim solution materializes, by the end of the year gyms and classrooms will be conscripted. Although no responsible official confirmed that any such plan is in the offing at CMC, the evidence leads inexorably to that conclusion. The Governor's budget for Fiscal Year 1985–86 includes a capital outlay project to convert classrooms at CMC (Buildings B, D, L and Q) into inmate housing units. Also the gymnasium has been designated as an emergency housing area, although the Department disclaims any intention of dedicating it to that use. I find that it is critical to the constitutionality of conditions of confinement at CMC that neither the classroom facilities nor gymnasium be converted to housing so as to deprive the present population of inmates of the same opportunity for education and recreation they currently enjoy.

30. The California Department of Corrections has no specific plan to eliminate double-celling.[34] However, according to

---

30. Narrative Statement of Gregory W. Harding, Deputy Director for Evaluation and Compliance in the Department of Corrections, p. 6.

31. 1984 Projections of the Department of Corrections.

32. *See, e.g., Wilson v. Deukmejian,* Marin County Superior Court No. 103454 (forbidding double-celling in San Quentin's "mainline" housing units), currently on appeal; *Toussaint v. Yockey,* 722 F.2d 1490 (9th Cir.1984) (affirming preliminary injunction forbidding double-celling in "lock-up" units at several Northern California prisons); *Toussaint v. McCarthy,* 597 F.Supp. 1388 (D.C.Cal.1984) (permanent injunction banning double-celling in "lock-up" units at San Quentin and Folsom prisons); *In re Daily,* Monterey Superior Court Nos. 976 and 1014 (writs requiring that the population at CTF (Soledad) be reduced by one-half), currently on appeal.

33. *See* excerpt from Phase I Report, California Department of Corrections Plan to Implement

the Findings of the Court in *Wilson v. Deukmejian,* October 28, 1983, attached hereto as Appendix IV.

34. Clearly it should have. Overcrowding and in turn double-celling at CMC are the product of a problem too long ignored and too disjunctively tackled. It is fundamental to our society that the criminal justice system be carefully in balance with our constitutional heritage. California on the one hand has elected to send more criminals to prison for longer periods of time, but on the other has neglected to provide the resources to staff, support, and humanely sustain the population of inmates that decision will generate.

Planning has lagged behind reality. It is imperative that it catch up. It is equally important that the task of planning and implementing a plan for the resolution of overcrowding in general, double-celling in particular, be done for the system as a whole, by those who are profes-

the ranking officer to testify, as design capacity increases the goal will be to decrease double-celling where it is the least desirable; because the Department looks on CMC as one of the most undesirable to double-cell, it will be among the first facilities to be relieved.[35] I find the representation of CMC's priority for the end of double-celling to be critical to the constitutionality of conditions of confinement at CMC.[36]

31. The systemic problem is not insoluable. As the Washington experience attests, a system in crisis can be turned around. Some or all of the steps taken there instruct here: (1) the United States District Court for the Eastern District of Washington ruled the conditions unconstitutional; (2) the Governor and Legislature responded 100 percent; (3) the Department of Corrections was established as a viable agency; (4) sentencing guidelines were established; (5) other facilities adaptable for inmate housing were sought and obtained; and (6) plans were developed and implemented for new institutions, add-ons, and realignment of spaces and unit arrangement.

## CONCLUSIONS OF LAW

### Subclass Certification

■ 1. The criteria for certifying a subclass of those inmates previously classified as requiring protective custody have not been met. There is no showing that the interests of such a subclass are not consistent with the class or that the impact of double-celling or overcrowding on those who were formerly classified with protective custody status differs from others in the class. Nor is there any showing that the needs of one protective custody inmate vis-a-vis the matters in issue are typical of, or held in common with, other protective custody inmates; that one such inmate may or may not prudently be celled with another inmate could not fairly constitute a binding determination that all such inmates may be similarly housed.

■ 2. Although the needs of Category J, K and O inmates are clearly distinct from those of general population inmates, the need for subclass treatment is not so clear. They share in common a legal right to adequate medical or psychiatric care; but their problems, including amenability to double-celling, are at once individual and subjective. Given the disparate and subjective nature of the problems which each of the J, K and O inmates has, and given the adequacy of the representation of their interests by the named plaintiffs, I conclude that there is no need for subclass certification. At the same time it must be recognized that the impact of overcrowding in the face of decreasing psychological and medical staff falls disproportionately on those most in need of professional services.

3. Neither the defendants' own classification system nor limiting the subclass to

35. Indeed the Department has been on record a number of times confirming the unacceptability

sionals in the administration of penal institutions (not by the courts, who are not), and not in piecemeal fashion, prison by prison. *See Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224 (1974); *Rhodes,* 452 U.S. 351, n. 16, 101 S.Ct. 2401, n. 16; *Hoptowit,* 682 F.2d at 1246; *Wright,* 642 F.2d at 1132, n. 1. In default of such planning, however, judicial intervention is inevitable although it will as inevitably solve one prison's problem at the expense of others. In effect this is the plight of CMC. Before that institution crosses the constitutional line on which it is poised, and in turn becomes a lead dominoe causing further unplanned crunches, the public through its legislature and executive has an opportunity and responsibility to respond.

of CMC for double-celling. For example, a June 23, 1981 memorandum on the impact of the *Rhodes* decision indicates that those cells used for psychiatric management cases and cells of "over/under" construction "preclude the placement of an additional bed in a cell." [Ex. 131.] Another memorandum reflecting a discussion of possible solutions to overcrowding suggested as one of them: "Never build another prison that has the capability of double-celling. For example: consider using the under/over bunk plan at CMC." [Ex. 44.]

36. In so finding I note that the Department has new prisons on line in the immediate future and to be completed by 1987. It has no specific program for filling those prisons, and thus has the clear opportunity to plan now for reducing the double-celled population at CMC.

those with protective custody, or medical/psychological problems, avoids the need for individual determination of membership. I am not satisfied that there is any objective means of doing so. *Compare Metcalf v. Edleman,* 64 F.R.D. 407 (N.D. Ill.1974) *with Barlaw v. Marion City Hospital District,* 88 F.R.D. 619 (M.D.Fla. 1980). Accordingly common questions of law or fact do not predominate; no particular plaintiff's interests would be typical of the subclass; and the claims of the subclass, to the extent they are special, have been represented by the named plaintiffs. Fed.R.Civ.P. Rule 23(a), (b)(2).

### Double-celling

 4. In analyzing plaintiffs' Eighth Amendment challenge to conditions at CMC, this court must look to discrete areas of basic human needs such as food, clothing, shelter, sanitation, medical care, and personal safety, and determine whether that condition is compatible with "the evolving standards of decency that mark the progress of a maturing society," *Wright v. Rushen,* 642 F.2d 1129, 1133 (9th Cir.1981). An Eighth Amendment violation may not be based on the "totality of conditions" at the prison. *Hoptowit v. Ray,* 682 F.2d 1237, 1247 (9th Cir.1982). However, while the principal focus must be on specific conditions of confinement, "each condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." *Wright,* 642 F.2d at 1133.

 4. To start with the cell itself, two persons in a typical CMC "over and under" unit pushes the limit of what is tolerable. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Although the unique design creates two units with a usable living space of 56 square feet each, the cells actually occupy only a total area of approximately 99 square feet. This has two consequences for the habitability of the quarters. First, the units do not contain the cubic footage that normally would accompany a seven foot by eight foot area—space that would be used for storage or for head room. Second, and more importantly, the units cannot accommodate tiered bunks, so that the two beds must be placed side by side. *Compare Rhodes,* 452 U.S. at 340, 101 S.Ct. at 2395 (63 square foot cells contained a two-tiered bunk bed). When the extra bed is lowered, unoccupied space is reduced from approximately 39 square feet to 23, or about 11.5 per person. Moreover, only about a 5–6 inch strip separates the beds, making it necessary to walk on the beds themselves to reach the desk or toilet. Neither defendants' formal administrative standards, their informal working policies, the testimony of their expert, nor the standards of the correctional profession, supports the conclusion that such cramped living conditions are desirable or adequate.

At the same time there is no substantial indication of inadequate cleanliness, ventilation or sanitation. Each cell has a window which opens. All have a desk and storage area, albeit greatly diminished in usefulness on account of double-celling. At least half have electrical outlets for radios or TV. Those double-cells with lower berths have marginally inadequate lighting. Noise is a concern, particularly over time and with overcrowding, but does not reach intolerable levels.

Thus, I cannot conclude that shelter, while plainly undesirable, inadequate and uncomfortable, is *unfit* for human habitation. *Hoptowit,* 682 F.2d at 1237.

 5. As defendant's expert emphasized, and as the Supreme Court's decision in *Rhodes* makes clear, these cramped living conditions must be placed in context. Secretary Reed stressed several factors as particularly significant in assessing the pain inflicted by a cell of minimal size: the characteristics of the prison population; the prison staff's morale; the amount of time the inmate has to spend in the cell each day; the opportunities available for activities outside the cell (the "extended space" available to the inmate); and final-

ly, the ability of the prison staff to be flexible and responsive to individual needs and problems created by double celling. My own contact with the prison, its inmates and staff over the last year leads me to conclude that for CMC, Reed's analysis reflects the factors relevant to an accurate assessment of whether the conditions of habitation at CMC cross over the Eighth Amendment line.[37]

First, the CMC inmate "profile" is of an individual more likely to be victimized in the prison environment than to be a victimizer.[38] *Compare Hoptowit.* The tone, if not positive, is not threatening. Although the numbers of Level IV security inmates have increased, there is no substantial evidence that that increase among those inmates assigned to CMC bears any causal relationship with an increase in propensity to violence among the general population. Further, there is extraordinary quality to the inmate leadership. So long as the inmate population is composed of the type of prisoner traditionally housed at CMC, it is less likely for it to experience the same magnitude of violence as other institutions in crisis, almost no matter how oppressive the living conditions become.

A second, and equally important, reason for the relative lack of critical tension is the ability and concern of the prison staff.[39] Despite two full weeks of testimony and a voluminous documentary record, there is almost no evidence of occasions where the prison staff has demonstrated indifference to the problems or needs expressed by inmates. Although increasing to 4000 the number of people living in a facility built

for 2400 obviously places strains on every aspect of prison management, I have been impressed with the staff's morale, their experience, and their determination to continue to do their job under increasingly difficult circumstances.

 On the other hand, despite the perseverance of the inmates and the concern of the staff, the steady increase in double-cells (in the last fourteen months, the number of doubled cells has increased from 25% to 75%) has led to the deterioration of critical conditions which previously served to alleviate the stress of living in a CMC cell. While I conclude that the deterioration, in context, does not yet make double-celling unconstitutional, it has occurred in critical areas and has reached the critical point. These are as follows:

A. Inmates are locked in their cells for an increasingly long period each day. The amount of time prisoners are able to spend away from their cells is pivotal in determining whether the conditions of their confinement involve the wanton and unnecessary infliction of pain. *See Bell v. Wolfish,* 441 U.S. 520, 543, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1976); *Hoptowit,* 682 F.2d at 1249. *See also Rhodes,* 452 U.S. at 341–42 and 349 n. 15, 101 S.Ct. at 2396–97 and 2401 n. 15. At CMC the time prisoners spend in their cells has increased from little more than sleeping time to include approximately three hours during the course of the day; this figure can only increase as Phase IV is completed. The court noted in *Hoptowit* that "[t]he longer the prisoner is without [his rights], the closer it becomes

**37.** As the Court noted in *Hoptowit:* "In determining whether a challenged condition violates 'evolving standards of decency,' courts may consider opinions of experts and pertinent organizations. But these opinions will not ordinarily establish constitutional minima. What experts may consider desirable may well constitute appropriate goals to which the other branches may aspire but they do not usually establish those minimums below which the Constitution establishes a prohibition. *See Rhodes v. Chapman, supra,* 101 S.Ct. at 2400 n. 13. Indeed, they weigh less heavily in this determination than what the general public would consider decent. *Id.*" 682 F.2d at 1246. Other than Secretary Reed's testimony, there is no

evidence in this case of what the general public would consider decent except to the extent that public opinion is reflected indirectly in the failure to act in the face of obvious overcrowding and previous court-ordered reduction in prison population and double-celling.

**38.** *See supra* at 413–14.

**39.** In this connection I recognize the Supreme Court's admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes,* 452 U.S. at 349, n. 14, 101 S.Ct. at 2400, n. 14.

to an unwarranted infliction of pain," 682 F.2d at 1258; and without question, the increased length of time CMC prisoners must spend in unacceptable quarters is a serious aggravation of the discomfort created by the cell itself.

B. Double-celling increasingly has the appearance of being indefinite. In *Bell*, the Supreme Court identified the length of time of confinement as a factor relevant in determining whether doubled cells are unconstitutional: "Our conclusion [of constitutionality] in this regard is further buttressed by the detainees' length of stay at the MCC. [Citation omitted.] Nearly all of the detainees are released within 60 days. We simply do not believe that requiring a detainee to share toilet facilities and this admittedly rather small sleeping space with another person for generally a maximum period of 60 days violates the Constitution." 441 U.S. at 543, 99 S.Ct. at 1876. Thus, although the permanence of double-celling is not in and of itself a violation of the Eighth Amendment, *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400, it is a factor to be considered together with the size of the cells and the opportunities for inmates to leave their cells during the normal routine of prison life. *Bell*, 441 U.S. at 541–43, 101 S.Ct. at 1875–76; *see also Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Hoptowit*, 682 F.2d at 1258.

Here, the confluence of two factors renders even more demoralizing the spectre of double-celling: First, the facility soon will be operating at 180% of capacity, so that there is little chance (or hope, which is equally important) of eventually being transferred to a single-cell; and second, system-wide overcrowding makes CMC's expectation for relief from its own, recede into the future. The combination of these factors makes this case different both from *Rhodes* (138% versus 180% of design capacity), where an inmate reasonably could expect to be single-celled some time during his incarceration, and from *Bell* (60 days of custody versus one year to life), where the condition of confinement had a foreseeable end. So long as neither density nor duration may be expected to diminish, CMC's cells become that much more intolerable. By the same token, so long as there is light at the end of the tunnel, the severity of double-celled incarceration is correspondingly lessened.

C. The number of single-cells is decreasing beyond that which is necessary to respond to inmates' medical, psychological, and emotional needs. The degree of overcrowding in a prison is relevant not only to determine when the population itself becomes a wanton infliction of pain, *see Hoptowit*, 682 F.2d at 1249, but also because severe overcrowding sets limits upon the prison administration's ability to respond flexibly to housing problems arising out of double-celling. *See, e.g., Fischer v. Winter*, 564 F.Supp. 281, 294 (N.D.Cal.1983). Some single cells are necessary if there is to be a safety outlet for general housing inmates who manifest signs of harm as a result of being double-celled; many more must be reserved in this prison given the large number of J and K inmates whose psychological needs require single housing, and of O inmates who require a single cell for medical reasons. The record indicates even now that housing constraints rather than the determination of doctors, psychologists, or counsellors have come to drive the decision whether to double-cell. As the number of inmates climbs further, it will be increasingly impossible for the staff to meet minimal housing needs of those inmates whose psychological, medical, and emotional needs make double-celling a cruel infliction of needless pain.

D. The "extended space" available to inmates is decreasing. Unquestionably, idleness and the lack of programs are not Eighth Amendment violations standing on their own. *See Hoptowit*, 682 F.2d at 1254. The reason is that "limited work hours and delay before receiving education do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." *Rhodes*, 452 U.S. at 348, 101 S.Ct. at 2400. On the other hand, to the extent that alternatives outside the cell become minimized, actual time spent in the cell inevitably increases and the ill ef-

fects of double-celling are magnified. The defendants recognized the importance of programs in an overcrowded prison when they made the preservation of existing work, educational, and recreational opportunities a priority in housing decisions, and my order denying a preliminary injunction rested heavily on the continued existence of things such as recreational and vocational programs and equipment, prison employment opportunities, and visiting facilities which mitigated the impact of the doubled cell in this case.

With the addition of 1500 (soon to be 1800) inmates at CMC, these facilities have become less accessible and an increasing number of inmates have little to do outside their cell. Given the unprecedented lack of space in the double-cells at CMC, a constitutionally devastating blow would be the conversion of classrooms or the gymnasium to house additional prisoners. The disruption of programs and diminution of "extended space" caused by a reduction in classroom or recreational facilities would alter impermissibly the balance of conditions surrounding the housing of CMC inmates in doubled cells.

### Overcrowding

6. Overcrowding itself is not a violation of the Eighth Amendment, *Hoptowit*, 682 F.2d at 1249, unless specific effects flowing from that condition form the basis for a violation. So measured, size of the population at CMC has not yet, in and of itself, become an unnecessary or wanton infliction of pain. *Id.* Moreover,

there is no substantial evidence to support a conclusion that any particular degree of overcrowding in excess of design capacity exceeds the constitutional minimum. *Id.* However I credit Secretary Reed's testimony that institutions are best managed in quadrangle units of 400–500 each. I also note that the double-celling condoned in *Rhodes* put SOCF at 138% of design capacity, whereas CMC is presently at 159.7%, heading to 179.5% with the completion of Phase IV. In my judgment, overcrowding by more than 50% is fraught both with constitutional and practical peril; nevertheless as *Rhodes* and *Hoptowit* correctly direct, "the Eighth Amendment does not reflect what any of us in the judicial branch might believe to be desirable, but rather requires a mere minimum standard of life's necessities."

### Medical Care, Sanitation, Food, Clothing and Safety

7. Inadequate attention to medical care, clothing, facilities for hygiene, sanitation, food service, exercise, safety, access to programs, and visitation may implicate the Eighth Amendment if the State has been deliberately indifferent to inmates' needs. *Hoptowit.* However none of the conditions found to exist at CMC alone amounts to an unnecessary and wanton infliction of pain. *Id.* Nor does the conduct of CMC with respect to any one of these conditions of confinement constitute deliberate indifference. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hoptowit.*[40]

---

**40.** While medical staffing is inadequate for surgery and only marginally adequate for psychiatric services, reasonable access is available to competent care and I cannot conclude that these services are so deficient that they reflect deliberate indifference to inmates' needs. *See Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *cf. Hoptowit,* 682 F.2d at 1253-54. The hospital's failure to comply with licensing requirements does not rise to the level of a constitutional violation; such standards are not imported into the Eighth Amendment. *See Hoptowit,* 682 F.2d at 1254.

The physical plant (including lighting, plumbing, food, sanitation, cleanliness and ventilation) is well maintained and poses neither an actual nor threatened Eighth Amendment problem except for fire safety procedures. As to them, the evidence affords no basis for articulating a standard that I may conclude is a constitutional minimum. However, basic good sense and the testimony of Secretary Reed suggests that, at a minimum, those precautions ordinarily taken in public institutions be in place at CMC as well. There is no indication of deliberate indifference to fire prevention or on account of the presence of safety hazards; however in light of the record at trial and my own observations about the absence of safety devices and procedures, the Eighth Amendment is implicated and failure to redress obvious deficiencies [*see* Findings, *supra* at 421–22] can only

8. I have considered the effect of each condition of confinement in the context of the prison environment. Because of the severity of the condition of shelter, each of the other conditions is more closely related than would otherwise be the case. *See Wright*, 642 F.2d at 1133. Those having to do with recreation, programs, in-cell confinement, and classification are most crucial. I conclude that so long as there is a margin of flexibility with respect to the shelter condition, and so long as there is adequate "extended space" to compensate for the deprivation of in-cell space, neither alone nor in context is there a constitutional violation.[41]

### Penological Purpose

 9. Because it was conceived as a temporary response to exigent circumstances, and as a more palliative alternative to systemic overcrowding and court-ordered reduction in population of selected Northern California institutions than conversion of educational and recreational facilities, double-celling at CMC is not wholly without penological purpose. *Rhodes; Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Estelle.*

### Violations of State Law

 10. To the extent that plaintiffs seek enforcement of rights created by California statute, for this court so to act would contravene the Eleventh Amendment. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *cf. Hoptowit*, 682 F.2d at 1255 (decided before *Pennhurst* ).

 12. No liberty interest is created by, nor have plaintiffs been deprived without due process of rights arising under, California law.[42]

lead a court in the future to conclude that they have been ignored through deliberate indifference.

Classification in and of itself does not constitute an Eighth Amendment violation, *Hoptowit*, 682 F.2d at 1235, without considering that process as part of the "totality of conditions" at the prison; nevertheless it must be noted that housing choices are critically influenced by double-celling and that this is particularly sensitive in an institution such as CMC, designated for the housing of psychologically and medically unique prisoners. Neither increasing idleness nor lack of immediate assignments constitutes the infliction of pain. *Rhodes*, 101 S.Ct. 2399; *Hoptowit*, 682 F.2d at 1254. Nor does an increase in violence which is not plainly out of proportion to the increase in the population, *Rhodes*, 101 S.Ct. 2399, or out of control, *Hoptowit*, 682 F.2d at 1249–51, amount to an Eighth Amendment violation. *See Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.ct. 1759, 68 L.Ed.2d 239 (1981).

Prisoners in special treatment units and administrative segregation at CMC are provided with adequate food, clothing, shelter, sanitation, and medical care. Although inmates in administrative segregation are not literally given outdoor exercise, the area in which they are permitted to exercise is exposed to fresh air by an open screen around the top of the room. The fact that inmates housed in SITU, ITU, P-cells and Administrative Segregation have substantially fewer privileges or programs is not an element of a constitutional violation, so long as they are not deprived of basic necessities. *Hoptowit*, 682 F.2d 1258.

41. The same conclusion obtains viewed alone or in combination. *See Rhodes*, 101 S.Ct. at 2399; *Hoptowit*, 682 F.2d at 1246, n. 3.

42. Specifically, plaintiffs claim a liberty interest in medical and mental health treatment pursuant to Title 15 of the California Administrative Code, sections 3350, 3360 and 3362; in the worktime credit under California Penal Code section 2933(b); and in visitation by virtue of sections 2600 and 2601(d) of the Penal Code and Title 15, California Administrative Code sections 3170–3178. *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

With respect to medical and mental health treatment, failure of the Department of Corrections to conform to state licensing requirements for hospitals does not deprive plaintiffs of a protected right to treatment when competent medical care is readily assessible. Although the department is obliged to provide every reasonable medical, surgical and dental service, and to maintain adequate facilities and staff for such service, 15 Cal.Admin.Code § 3350, resources in the community are available to assure that no inmate is denied the right to appropriate treatment. "Substituted" service of this sort suffices for purposes of the Eighth Amendment, *see Hoptowit*, 682 F.2d at 1253, and for purposes of due process as well. Specialized mental health programs must be provided to the extent resources are available, § 3360, but there is no indication that available resources are not being devoted to this cause. Nor is there any indication that persons committed to the department are not being informed, pursuant to section 3362, that

*Summary of Conclusions*

In assessing all these factors, I cannot say that double-celling has transformed CMC into "a riot in slow motion." That cannot be the end to constitutional inquiry, however, for so to conclude would be to say that a ship is not sinking until it lies entirely beneath the waves. Although they have weathered it responsibly and maturely, the inmates at CMC have been and still are subjected to an ordeal which comes to the brink of a constitutional violation. The cells themselves are more cramped and awkward than any of which I am aware that have passed constitutional muster; the inmates appear to be consigned to such living conditions for the foreseeable future; and the reduction of single-cells has approached the point where the minimal psychological, medical, and emotional needs of the inmates no longer can be satisfied. However, I must conclude that no constitutional violation exists at this time. I reach this decision only because each of the following conditions presently holds:

(1) No classroom, gymnasium, or yard space has been converted to other uses.

(2) After completion of Phase IV, 600 cells will remain single-celled.

(3) The length of time inmates must normally spend in the cell does not average more than 11–12 hours per day.

(4) As soon as new prisons are on-line and by 1987 in any event, the Department of Corrections will have begun to phase out double-celling at CMC.

APPENDIX I

I. *Immediate freeze on CMC-East institutional intake* (with the exception of Atascadero State Hospital returns—those limited numbers of [J & K] inmates described as not passing through the usual inmate reception unit [Infante Testimony; Garvis Deposition]).

II. *No transfers from CMC-East* except for (1) those transfers which would be accomplished in the normal practice of classification changes to lower security institutions and (2) those transfers which would be effectuated to resolve security problems (e.g. transfers to a higher level institution due to serious CDC 115s; transfers to another institution due to an enemy problem. etc.). Thus, a gradual reduction in CMC-East population will occur without aggravating conditions in rest of system by mass transfers, nor will any inmates be threatened by the usual consequences of mass transfers; plus—an increasing stability in CMC's present population will result, with inmates willing to cooperate with CMC officials to effectuate orders to solve present problems because they can see relief at some future point.

III. At the same time, if defendants want to propose some limited form of constitutionally acceptable double-celling, further hearings can be scheduled [with an appointed master or the Court] (e.g., limited and legitimate voluntary double-celling, double-celling limited to last 14 days of sentence when an inmate has already sent home his property and is undergoing pre-release training and when prison officials have am-

mental health services are available to them or about evaluative interviews, counseling, or specialized treatment programs that may be available.

So far as entitlement to work credit is concerned, section 2933(b) provides that "[w]orktime credit is a privilege, not a right." Further, that statute requires only a "reasonable opportunity" to earn credits and only as "available resources" permit. Although a delay may be encountered, inmates at CMC are not being denied a reasonable opportunity to earn work credits, nor is there any basis upon which to conclude that programs are not consistent with available resources. Finally, there is no evidence that plaintiffs have been denied credits in which

they have a vested interest; to find a deprivation in the absence of such a showing would be both premature and unfounded in light of section 2933(a), which assures that each prisoner willing to participate in a full-time credit assignment but who is not so assigned shall receive no less credit than provided for those who do.

Visitation rights are guaranteed by Penal Code sections 2600 and 2601(d). However there is no evidence that such rights are being denied, or that curtailing the time regularly allowed for visiting on three occasions during the past year because of crowding was not "necessary for the reasonable security of the institution," § 1601(d), or effectively denied any inmate the right to have a personal visit.

ple time to provide adequate screening, etc.) Experts from both sides should testify, e.g. as to what medical and psychiatric services would be appropriate for these double celled inmates, acceptable length of time confined to double-cell, etc. These hearings should be paid for by defendants. These hearings could also include defendants proposals for alternate forms of housing at CMC, e.g., level II dorm type modular housing for selected CMC level III's, to be confined with CMC-East's perimeter. Any plan to add inmates must also provide adequate staff.

IV. Defendants provide the Court with comprehensive plans, including compliance dates, for the *complete* licensure of the CMC Hospital—*including the psychiatric unit.* If these plans are not adequate, the Court should order the correction of specific deficiencies.

V. Defendants provide the Court with comprehensive plans, including compliance dates, for the addition of staff which accomplishes at least the following goals: (1) brings CMC-East's staff/inmate ratio to that level which existed prior to overcrowding (prior to the installation of the first dorms); (2) brings CMC's medical staff up to levels required by Title 22; (3) brings CMC's psychiatric staff up to levels necessary to effectively treat the increasing numbers of J & K's presently confined at CMC because of system wide increase of J & K's and the crowding at CMF; (4) which takes into consideration the "compression" ratio as described by Mr. Moye (a special formula for additional staff per inmate made available to level III institutions because they house level IV inmates transferred to III institutions because of findings of unconstitutionally overcrowded conditions in level IV prisons); (5) increases critical categories of staff to monitor overcrowded housing units as emphasized by both Amos Reed and Craig Haney and (6) to provide for the continuation of major surgery at CMC-East.

VI. Defendants develop a program to reclassify *selected* CMC-East level III inmates for transfer to level II institutions.

This plan could be safely and quickly implemented at CMC because CMC-West, a level II institution, is the responsibility of the CMC Superintendent. Thus, East inmates could be carefully screened and moved to West with a continuity of management— and promptly returned to East if problems develop. Controls must be established to monitor any increased CDC 115 problems that may result. Security at West should be increased as West already contains some number of level III's [Salvado testimony]. This solution for crowding was suggested by Dr. Haney, it was used in Washington as stated by Amos Reed, and the existence of such a proposal was admitted by Gregg Harding. The Department of Corrections requires a court order to expedite this solution.

VII. Experts be appointed (to be compensated by defendants) to examine conditions of confinement in SITU.

VIII. A registered expert be appointed to provide an opinion on (1) the adequacy of the CMC general population diet and (2) the adequacy of the future operation of the badly needed CMC medical diet kitchen.

IX. Defendants provide additional family visiting trailers so that the same ratio of trailers to inmates that existed prior to CMC-East overcrowding exists now. Additional staff be hired to expand CMC visiting hours and areas to provide for the non "termination" of visits during the upcoming fall and winter of 1985. The importance of visiting was emphasized by inmate testimony, by Amos Reed and Dr. Craig Haney, and is clear from two of the articles prepared by Dr. Ekland Olsen.

X. Defendants provide additional P.C. 2933 assignments so that all CMC-East inmates receive all credits and privileges available by law—subject to their individual in-prison behavior. On a temporary basis, until this is completely effectuated, defendants implement a plan whereby any willing inmate not assigned to a job will not lose in-prison privileges or time credits.

XI. Defendants perform air balance and load capacity tests to insure that the CMC ventilation system is delivering adequate

supplies of fresh air to each CMC cell (plaintiffs accept defendants' expert in this regard). Defendants implement a plan to educate inmates about the ventilation system and provide regular cleaning and inspection of the in-flow and exhaust ducts in each cell at CMC.

XII. Defendant modernize their procedures and equipment concerning fire safety. Automatic alarms and sprinkler systems should be installed in the cell blocks. Automatic sprinklers should be installed in the industry areas and shops. Compliance with ACA and State Fire Marshal standards should be the final objective concerning fire safety procedures.

XIII. Defendants implement and strictly enforce procedures which control the noise in overcrowded cellblocks. The controlling philosophy behind these procedures should be the elimination of unnecessary noise, e.g. mandated use of headphones for TV's and radios, not the use of inmate earplugs. Defendants provide the Court with a cost analysis of the cost of bringing CMC cells up to the noise standards required by the ACA.

XIV. Defendants provide regular *outdoor* exercise for all inmates confined in the Admin. Seg. and Admin. Seg. Annex. Defendants convert those cells presently double-celled in Admin. Seg. to "over and under" single cells.

XV. Defendants provide every CMC inmate released to society, either on parole or at the expiration of their sentence, with pre-release programming.

MONITORING

1. Plaintiffs' counsel allowed continued access to CMC-East through FRCP motions.

2. Plaintiffs' counsel allowed same access to Inmate Litigation Team and MAC elected leaders as prior to trial.

3. Defendants ordered to prepare reports as to I and II on a weekly basis.

4. Defendants ordered to provide copies of critical reports to plaintiffs' counsel (e.g. monthly discipline reports, B-Quad Inmate Reception Unit Report, monthly records as to inmates entering and leaving Cat. J & K classifications, etc.). The objective would be to provide the Court with a readable and comprehensive set of monthly indicators of critical measures of inmate services and institutional controls: e.g. infractions rates, transfers, number of inmates in double-cells, staff in critical categories, inmates assigned to P.C. section 2933 assignments, medical and psychiatric services, etc.

5. Plaintiffs' counsel allowed continuation of agreed upon one phone call per week to Alan Dohner, outside Dohner's usual working hours, that call limited to 15 minutes unless special circumstances, counsel allowed emergency access to Dohner if legitimate emergency arises.

Central District precedent for this approach: Judge Gray in *Rutherford v. Pitchess*

APPENDIX II

EXH. 113–3
Typical Double Cell
(U/L Config.)

EXH. 113–4
Typical Double Cell
(U/L Config.)

EXH. 113–5
Typical Double Cell

EXH. 113–6
Typical Double Cell
(L/L Config.)

EXH. 113–7
Typical Double Cell
(L/L Config.)

438

EXH. 113–8
Typical Double Cell
(L/L Config.)

APPENDIX III

Numerous professional and correctional organizations have promulgated "minimum standards" for cell size. They include the following:

a. *70 square feet*—National Sheriff's Association at 63 (1975).

b. *70 square feet*—Building Officials and Code Administrators, Inc. BOCA Basic Building Code, 1975, § 201.3.

c. *70 square feet*—National Clearinghouse for Criminal Justice Planning and Architecture.

d. *75 square feet*—American Correctional Association. Manual of Corrections Standards, 49.

e. *80 square feet*—National Advisory Commission for Criminal Justice Standards and Goals, Corrections, Standard 11.1, page 353.

f. *90 square feet*—The International Conference of Building Officials, Uniform Building Code, § 1307B, p. 83.

g. *60 square feet in a cell, 75 square feet in a dormitory*—American Public Health Association.

h. *50 square feet*—in holding facilities, *60 square feet* for regular cells, unless inmates are held within those cells more than ten hours per day, in which case the standard is *70 square feet* in detention facilities and at least *80 square feet* in long term facilities. A minimum of *60 square feet* per inmate is required for detention dormitories. One inmate per cell in long term institutions. Federal Standards For Prisons and Jails, 1980, Subsection 2.02, 2.03, 2.04, 2.05, 2.06.

The California Board of Corrections has promulgated standards for detention facilities, cited at California Administrative Code, Title 15, sections 1000 et seq. Defendant McCarthy's predecesor, Ruth L. Rushen, helped fashion these regulations.

Section 1116 of the Administrative Code mandates 60 square feet in single occupancy cells in Type I facilities and 70 square feet in Type II and Type III facilities. (Type I facilities are designed to hold a detainee not more than 48 hours; Type II facilities are designed to hold a detainee before and after arraignment, during trial, and before committment; and a Type III facility is designated for sentenced prisoners who are committed for one year or less). Minimum standards for Multiple Occupancy cells under the regulations is 35 square feet per person, with a minimum total square footage for multiple occupancy cells of 100 square feet. (Title 15, section 1117). Minimum standards for Multiple Occupancy Rooms is 50 square feet, with a minimum total square footage for multiple occupancy rooms of 100 square feet. (Title 15, section 1118).

APPENDIX IV

# CALIFORNIA DEPARTMENT OF CORRECTIONS
# PLAN TO IMPLEMENT THE FINDINGS OF THE COURT
# WILSON VS DEUKMEJIAN
## PHASE I REPORT

CASE NO. CV83-7587 PHR

Dohner

VS. McCarthy

PLAINTIFF'S EXHIBIT 64

DATE _____ IDE:

DATE _____ EVI'

BY _____
AO 386 Deputy Clerk

# SAN QUENTIN STATE PRISON
# OCTOBER 28, 1983

* * * of identification of the transferred class, the conditions of the confinement to which the transferred class will be subjected, and the expected impact of this plan.

B. *Development of the Needed Bed Space*

The California Men's Colony, at 102.5% of design capacity, is currently the least overcrowded celled institution in the California Prison System. This is due to the unique inmate profile at CMC and the long standing departmental position that the cell design at CMC precludes double-celling. In light of the current extreme emergency, this position has now been reevaluated to provide for some double-celling at this institution. It would allow the Department to implement the Wilson Decision and handle general overcrowding in the system. Al-

though highly undesirable, double-celling at CMC is a feasible temporary emergency plan. The photographs on the following pages portray how the CMC double-cells will appear.

It should be noted that this plan to double-cell some CMC· cells is being utilized as an alternative to other proposals, such as the use of Youth Authority facilities, which were denied "by the" Legislature.

\* \* \* \* \* \*

The plan provides for a cap of 450 cells that may be double-celled at CMC. This is necessary in order to cope with the current population pressures aside from the Court's Order, and to continue to provide psyciatric/medical services to inmates. An increase in double-celling capacity beyond 450 would seriously hamper institution operations, diminish the ability to house and provide services to new departmental arrivals that have psychiatric disorders, or prevent psychiatric evaluation of inmates for the Board of Prison Terms.

Some physical security modifications and staff augmentation will be necessary in order to provide the appropriate support system for newly developed beds at CMC.

Although this planned transfer of inmates can be implemented prior to the necessary security modifications and augmentation of staff, there is a definite risk inherent in transferring inmates to less secure overcrowded facilities. The Department expects the following possible adverse consequences to result from this decision:

1. Increased violence through assaults on both staff and inmates.

2. Increased number of unassigned inmates due to lack of custodial supervision.

3. Decrease in program time due to lack of custodial supervision.

4. Decrease in out of cell time due to lockdowns resulting from violent assaults.

5. Disruption in the schedule of inmate services, such as canteen, feeding and visiting.

The Department will however make every effort to review all operational procedures to maintain the status quo, and will do everything possible to ensure the safety of staff and inmates.

C. *Temporary General Population Housing*

This plan is premised upon the fact that some limited involuntary double-celling of general population inmates may be necessary at San Quentin. This will provide a necessary "safety-valve" for the inherent and unavoidable fluctuation in inmate population, due to the following:

1. Population intake into San Quentin is not limited to new commitments from the reception centers. Frequently, inmates are housed inside the institutional security perimeter as a result of incidents in the minimum work crew quarters, and inappropriate case endorsements for G unit, the transient quarters. These situations do not allow inmates to safely remain in minimum custody settings.

2. General population inmates from other institutions are frequently received at San Quentin for specialized medical treatment, court appearances in Northern California counties, or as safekeepers, (see Penal Code Section 4007) from other counties, State, or Federal facilities.

3. Inmates requiring release from Security Housing and Management Control Units.

\* \* \* \* \* \*

4. The inmate must have no history of the following: assaultive behavior on staff/inmates; escape; possession of weapons; inciting disturbances; smuggling/trafficking in narcotics; or causing serious injury.

5. No inmates with Condemned or Life Without Possibility of Parole commitments.

6. Inmates with "First Degree Murder" commitments must have served a minimum of 3 years as well as meeting the above criteria.

Using this criteria, the Department of Corrections was able to identify a potential "pool" of approximately 2100 inmates out of the some 5100 inmates in Level IV institutions which could be considered for transfer to Level III institutions. Of this "pool" it is estimated that approximately 50% of the inmates will remain eligible after each inmate is given an individual review and other personal factors are taken into account.

The computer profile characteristics used to identify Level III inmates with the potential for transfer to the Level II institution or California Men's Colony are as follows:

1. No inmates currently housed at California Men's Colony (CMC) or California Medical Facility (CMF).

2. Inmates must not have serious Protective Custody needs which cannot be satisfied at receiving institutions.

3. Classification score must be 30–39.

4. No escape history other than non-violent walkaways.

5. No documented gang involvement.

6. No more than one hold, where a new prison sentence or deportation is likely.

7. No inmates with commitment of Life Without Possibility of Parole.

Using this criteria, the Department of Corrections was able to identify a potential "pool" of approximately 3000 inmates out of approximately 6600 inmates in Level III institutions which could be considered for transfer to Level II institutions or the California Men's Colony. Of this "pool", it is estimated that approximately 50% of the inmates will remain eligible after each inmate is given an individual review and other personal factors are taken into account.

This analysis is expected to result in a total of approximately 5000 Level IV and III inmates that could possibly be considered for transfer to lower level institutions, or laterally transferred in the instance of Level III inmates to CMC. This does not in any way indicate that all inmates in the identified "pool" are eligible for transfer. As stated above, it is expected that only approximately 50% will remain eligible after professional scrutiny of the individual inmate. The reasons for exclusion will include the following:

